## Wytheville.

### HUDSON v. WAUGH.

#### AUGUST 4, 1896.

Absent, Harrison, J.

1. RESCISSION—*Fraud—Mutual Mistake—Diligence.*—Rescission of a contract for the sale of real estate will not be accorded a vendee, either on the ground of fraud or of mutual mistake, unless the application therefor be made with due diligence. The vendee should promptly repudiate the contract, and offer to make restitution to his vendor of the benefits he has received. If, after knowledge of the facts constituting grounds for the rescission, the vendee continues to use the property as his own, and to make monthly payments on a debt which he has assumed as a part of the purchase price, and makes no complaint to his vendor whom he has fully paid, and, in the meantime, the property greatly depreciates in value, a court of equity will not thereafter entertain his bill for a rescission of the contract.

Appeal from a decree of the Corporation Court of the city of Roanoke, pronounced November 17, 1894, in a suit in chancery wherein the appellee was the complainant, and the appellant was the defendant.

*Reversed.*

The opinion states the case.

*B. Lacy Hoge* and *Phlegar & Johnson*, for the appellant.

*Moomaw & Woods*, for the appellee.

KEITH, P., delivered the opinion of the court.

J. B. Waugh exhibited his bill in the Hustings Court for
the city of Roanoke, from which it appears that on the 27th
day of April, 1891, he bought of one John P. Hudson four
parcels of land lying in the city of Roanoke, with improve-
ments thereon, for which he was to pay $300 in cash on each
lot, making $1,200; $2,804 payable with interest one and
two years from date, for which he executed his notes, and
assumed the payment of a lien of $2,796, which was due
from his vendor to the Old Dominion Building and Loan
Association, making the purchase price of the lots $6,800.

The lien for $2,796 arose in this way: Hudson had taken
certain shares of stock in the Association, and had borrowed
money from it; and, to secure its repayment, he had executed
deeds of trust which stipulate that he should pay to the
Association instalments amounting to $51 each month "un-
til such time as the shares of stock shall be fully paid up,
or for the period of eighty-four months, if said stock does
not become fully paid up before the expiration of that time."

The purchase was made by Waugh through F. W. Craig
and C. E. Moore, the agents of the vendor, J. P. Hudson,
and the bill charges that these agents represented that
$2,796 was the entire amount due by Hudson to the Old Do-
minion Building and Loan Association, and that when that
sum was paid in monthly instalments of $51.00 each, the
lots would be free from all encumbrance.

It further appears that the notes for $2,804, executed by
Waugh, were discounted by him and paid before maturity,
so that the only part of the purchase price of the lots which
now remains unpaid is the sum due the Building Associa-
tion.

About the month of June, 1892, Waugh discovered, as he
avers, that by the deeds of trust from Hudson to the Build-
ing Association, the lots were bound for about the sum of
$4,181, instead of the sum of $2,796, which he had assumed;
and he now claims that he was induced to enter into the

contract for the purchase of the lots upon the assurance of
the agents of his vendor that he would only be liable for the
sum of $2,796; that he was misled and deceived by their
statements, and, while unwilling to believe that they were
made with intent to defraud him, yet the consequence to
him is the same; and that a court of equity will grant relief
under the circumstances of the case, although the situation
may have resulted from a mutual mistake, rather than an
intentional fraud. The bill avers that Hudson is insolvent,
and that, if the complainant should be required to pay to
the Building and Loan Association a sum greater than that
contemplated in his contract, his right of action against
Hudson upon his covenant of warranty, and against encum-
brances contained in the deed from Hudson to Waugh, would
be a wholly inadequate protection. He therefore prays that
Hudson be made a party defendant to the bill, and that the
deeds of conveyance from Hudson to Waugh may be can-
celled, and the parties be restored to their original position.

To this bill Hudson filed an answer which admits the
purchase of the lots and the assumption by the complainant
of the sum of $2,796 to the Building and Loan Association,
and admits also that the sum stated in the bill as due
to the Building Association, at the time of the sale, is very
nearly the correct amount, including loan, interest, and dues
on stock, and claims that the difference between the sum
assumed by appellee and the sum claimed by him as actually
due to the Building Association, amounting to $1,288, is
made up of $400 interest accruing upon the $2,796, and
that the balance of $800 would be applied to the payment
of the stock in the Old Dominion Building and Loan Associa-
tion, which was transferred to the complainant. The an-
swer avers that the real agreement between the complainant
and respondent was that the houses and lots should be con-
veyed to the complainant, and the interest in the Associa-
tion should be transferred to him, and the complainant

should pay the principal of the money borrowed from the Building and Loan Association, and the interest, demands, and dues upon the same, and that if there was any mistake made in the drawing of the deed it was in the failure to state plainly that part of the monthly payments was for interest, part for demands and dues upon the stock, and part to be paid upon the principal of the loans which were made. The answer denies insolvency, and prays that the complainant's bill may be dismissed.

Upon the issues thus made, proofs were taken, from which it appears that the consideration for the purchase of the lots was as stated in the bill.

It further appears that Waugh did not content himself with the representations as to the condition of the title, and the amount of the outstanding encumbrances upon the property he was about to purchase that were made to him by Craig and Moore, the agents of the vendor, but that he declined to complete the negotiations until the title was reported upon by Mr. Pendleton who corroborated the representation made by Craig, fixing the outstanding encumbrances at $2,796.

It appears that the deeds by which the sums to the Building Association were secured were of record; that they disclosed the whole nature and character of the transaction between Hudson and the Building Association, and, if examined by Waugh, would have informed him fully as to the extent of the liability resting upon the property.

There is evidence which is strongly persuasive that he did actually see and inspect these deeds. Not to have done so, and to have relied wholly upon the representations of his vendor and his agents furnishes an unusual example of negligence and credulity. It was about a year after the transaction that the appellee admits that he became aware of the existence of an incumbrance upon the property greater than that which he had assumed, but, even after he

was fully informed with respect to it, he continued to make the monthly payments as they fell due.

It appears that, at the time of the transaction, these four houses were renting for the aggregate sum of $72 per month, and that after the lapse of a short time the rent fell off to $64 per month, and then to $60 per month, and continued to decline until the rents only amounted to $43 per month.

The controversy between the appellant and the appellee turns upon the time within which the shares of the Building and Loan Association shall mature. The sum of $2,796 assumed by the appellee is predicated upon the maturity of the shares of the Association in about fifty-five months. If they should mature within that time, then the obligation of the vendee would be precisely as fixed by his contract. Those shares may, perhaps, mature in a less period than fifty-five months, and, in that event, the encumbrance upon the property would be satisfied by the payment of a less sum than was contemplated by the appellee in his contract, or a greater length of time than fifty-five months may be required, in which event a sum greater than $2,796 would be necessary to satisfy the demands of the Building and Loan Association; but, in no event, could its demands extend beyond the payment of eighty-four monthly instalments, that being the limit of the obligation imposed by the deeds of trust for the benefit of the Building Association. Whether the shares shall mature within a longer or shorter period depends upon the profits of the business conducted by the Association. The evidence does not satisfactorily show at what period the shares in question may be expected to mature. While, therefore, there is a limit which the liability to the Building Association cannot exceed, it is not certain that there will be any responsibility imposed upon the appellee in excess of the amount assumed by him, or, if any, just how much it will be. These are the material facts to be considered in determining this controversy.

Do they entitle the appellee to a rescission of his contract for the purchase of the lots? The equities of the parties could be more easily adjusted if any part of the purchase money were yet due to the vendor. He would, of course, be restrained from enforcing his lien for the unpaid purchase money until the amount of the outstanding encumbrance had been ascertained, but here the vendor has been paid in full, and the Building Association occupies a position which is superior to that of the appellee. No protection, therefore, can be afforded the appellee in derogation of the rights of the Association. The facts proved do not establish a fraud; nor indeed is fraud distinctly alleged. There is, as we have seen, evidence that the whole transaction was disclosed to the appellee by his examination of the deeds under which the Building Association makes claim. This, however, he denies, and it is unnecessary to pass upon this issue of fact. It is certain that in June or July succeeding the transaction, the appellee became fully aware of all the facts as they are now exhibited in the record. It became his duty then to demand of his vendor some satisfactory indemnity against the claims of the Building Association, and if arrangements to his satisfaction were not made he should at once have demanded a rescission of the contract, accompanied by an offer upon his part of restitution to his vendor of all the benefits which he had received under it, so that both parties might be restored to their original position with as little loss as possible to either. Instead of doing this, he continued for some months, with full knowledge of the facts, to pay the monthly instalments to the Building Association as they became due, and in the meantime the rents were reduced from $72.00 to $64.00, to $60.00, and, finally, to $43.00 per month.

"A party who intends to repudiate a contract on the ground of fraud should do so as soon as he discovers the fraud; for if, after the discovery of the fraud, he treats the contract as a subsisting contract, or if, in the interval, whilst

he is deliberating, an innocent third party has acquired an interest in the property, or if, in consequence of his delay, the position even of the wrong-doer is affected, he will be deemed to have waived his right of repudiation, and must then bring an action for damages for the deceit." 2 Add. on Contracts, p. 772; *Max Meadows Land & Imp. Co.* v. *Brady*, 92 Va. 71.

This duty is perhaps, more imperative in the case of a mutual mistake. In *Simmons* v. *Palmer*, decided at the present term, *ante* p. 389, it is said: "The application for relief in such cases, upon the ground of mistake, must be made with due diligence, and what constitutes due diligence is to be determined by reference to the facts attending the particular case in judgment. The diligence required should be proportioned to the injurious consequences likely to result from delay."

It is difficult to resist the impression that the decline in the value of the property, as shown by the constantly diminishing rents, constituted the motive for demanding a rescission of this contract. Had the rents derived continued to be sufficient, and more than sufficient, to meet the monthly accruing instalments, it is probable that this controversy would never have arisen. It was only when the rents had fallen to $43.00 per month, $8.00 per month less than the demand of the Building Association for the same period, that the appellee determined to repudiate the contract, and instituted proceedings for its rescission. He had no right thus to delay and throw upon the appellant the burden resulting from a depreciation of the property. Had he acted promptly, and disaffirmed the contract as soon as he discovered the fraud or mistake of which he claims to have been a victim, it may be that the appellant could have averted, or, at least, have diminished the loss attending its repudiation.

As was said by Earl, J., in *Thomas* v. *Bartow*, 48 N. Y.

193: "In ordinary cases of tort and breach of contract, it is a fair and just rule which requires the injured party to use ordinary diligence to make his damages as small as he can, and confines his recovery to so much damages only as he could not by good faith and ordinary diligence have averted. Much more where a party comes into equity seeking relief on the ground of mistake should he show that he has used due diligence and good faith to avert the consequences of the mistake; and it would be a poor administration of equity that would give him relief after, by his delay and omission of duty, he had caused irreparable mischief to the other party."

Under the circumstances of this case, we do not think that the appellee is entitled to the relief afforded him by the decree appealed from, which must be reversed, and this court will enter such decree as the Hustings Court of the city of Roanoke should have entered.

*Reversed.*