# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## WILSON v. HUNDLEY.

### JUNE 16, 1898.

Absent, Keith, P., and Cardwell, J.

1. CONTRACTS—*Fraud in the Procurement—Rights and Remedies of the Defrauded Party.*—A contract induced by fraud is not void, but voidable only, at the option of the party defrauded. Upon discovery of the fraud, he may, as a general rule, either elect to rescind the contract, if he can restore what he has received in the same state or condition in which he received it, and recover back the consideration, or, if he has not paid or given anything, repudiate the contract, and rely, when sued, upon the fraud as a complete defence ; or he may elect to retain what he has received under the contract, and sue to recover damages for the injury he has sustained from the deceit. By the latter course he, in effect, affirms the contract, but does not waive or release his claim for damages arising from the fraud collateral thereto.

2. CONTRACTS—*Fraud in the Procurement—Election to Rescind or Affirm.*—If a party who has been defrauded in the procurement of a contract, elect, on discovery of the fraud, to affirm the contract, his election is final and conclusive. He has but one election to rescind, and, having once elected to affirm the contract, he cannot thereafter disaffirm.

3. CONTRACTS—*Fraud in the Procurement—Election to Affirm—Subsequent Discovery of New Incidents in the Fraud—Rescission.*—A party who has elected to affirm a contract which was voidable for fraud in its procurement cannot afterwards elect to rescind it upon the subsequent discovery of new incidents in the fraud. Knowledge of the fraud puts the party defrauded to his election. Subsequent discovery of new incidents of the fraud simply confirms the previous knowledge, and does not confer a new right to rescind.

4. STOCK SUBSCRIPTIONS—*Fictitious Subscribers—Liability of—Effect on Bona Fide Subscriptions.*—Fictitious or colorable subscriptions to stock, made and used with intent to induce others to subscribe, with the secret understanding that no liability shall attach to the subscribers, or that

they shall be allowed to withdraw, are as binding on the subscribers as if originally made in good faith, and the existence of such subscriptions does not operate as a release of *bona fide* subscribers.

5. STOCK SUBSCRIPTIONS—*Fraud in the Procurement—Subscriber Cannot Hold Stock and Sue for Damages.*—Although the general rule with respect to contracts which pertain to goods and chattels is that a defrauded party may elect to retain what he has received and recover the damages he has sustained by reason of the fraud, this rule has no application to subscriptions to stock in a joint-stock company. A person who has been induced by the fraudulent representations of an agent of a company to take shares in it, cannot, after he discovers the fraud, elect to retain the shares and sue the company for damages. His subscription is not only an undertaking to the company, but to all other subscribers. His contract of subscriptions binds him to contribute ratably to the payment of the company's debts and liabilities, whereas if such action were allowed, it would throw the burden of the payment of the debts and liabilities on the other shareholders, who are as innocent of the fraud as he.

6. STOCK SUBSCRIPTIONS—*Fraud in the Procurement—Remedy of Subscriber when Debarred of Rescission.*—If a shareholder in a joint-stock company is debarred from a rescission of his contract by the insolvency of the company, or any other cause, he is without remedy against the company, and is left to his action against the agent who, by his fraudulent representations, induced him to subscribe for the stock.

7. APPEAL AND ERROR—*Legislation after Judgment in Trial Court.*—A writ of error must be decided according to the law as it was at the time that the judgment complained of was rendered. Subsequent acts of Assembly cannot be considered.

Error to a judgment of the Circuit Court of Amelia county rendered April 10, 1896, in an action of *assumpsit*, wherein the plaintiff in error was the plaintiff, and the defendant in error was the defendant.

*Reversed.*

The opinion states the case.

*B. B. Munford* and *S. S. P. Patteson*, for the plaintiff in error.

*James Lyons, George J. Hundley,* and *W. W. Henry*, for the defendant in error.

RIELY, J., delivered the opinion of the court.

In the summer of 1890 George J. Hundley, the defendant in error, subscribed for 500 shares of the capital stock of the Rivermont Company, of the par value of $10 per share, to be paid for in instalments upon the call of the board of directors. On August 7, 1890, he made the first payment of $1,000, and on November 24, 1890, he made the second payment of $1,000, in pursuance of the second call of $2 per share, but made default in the payment of the three remaining calls of $1,000 each.

On June 2, 1893, the company made an assignment of all its assets, including unpaid subscriptions to its stock, to William V. Wilson, Jr., the plaintiff in error, in trust for the benefit of its creditors, who brought this suit to recover from the said Hundley the balance due on his subscription. Against its recovery he set up the defence of fraud in the procurement of the subscription.

The fraudulent representation mainly relied upon was that Warwick & Carson, the agents of the company through whom the subscription was made, represented that certain persons, called the "Roanoke Syndicate," had subscribed to the stock of the company to the amount of $700,000, which was nearly one-half of the whole amount of its capital stock of $1,500,000, which representation was not true; that the "Roanoke Syndicate" only subscribed absolutely for $150,000 of the stock, and took merely an option on $550,000 more of the stock; and that the defendant did not learn of this misrepresentation until after he had paid the first and second calls on his subscription.

It appeared in evidence that the defendant, having heard that the "Roanoke Syndicate" had not subscribed for $700,000 of the stock, according to the representation of Warwick & Carson, wrote, on January 20, 1891, to Charles M. Blackford, the president of the Rivermont Company, stating what he had heard as to this matter, inquiring as to its truth, and making

complaint if it were true.   The president replied to his letter the next day, and stated that the "Roanoke Syndicate" subscribed absolutely for $150,000 of the stock, upon which they had paid as the calls were made, and had "an option on several hundred thousand more," which had not yet expired. Upon the receipt of the letter of the president, the defendant wrote, on January 22, 1891, to the general manager of the company as follows:

"I wrote Major Blackford that I had heard a large subscriber to the stock here say that the Roanoke people only took an option on the stock, and some seemed disposed to kick on that account.   Major Blackford responded that the Roanoke people had only taken $150,000; this leaves, I suppose, the stock taken only about $1,000,000, and throws a heavier burden on us than we anticipated, but I don't know that it will eventually hurt us.   I hold this position though, I am with you for good or evil, and I mean to stand by you to the best of my ability and hold up your hands.   I have the utmost confidence in you and Captain Blackford.   I have so far paid up my calls, hard as the time was when the last one was made.   I have just received another which I did not expect, and which Warwick & Carson say is earlier than it ought to have been for us who came in later.   I shall do my best to meet it; if I don't, I am willing to pay interest and secure it if required.   *   *   *   It was intimated to us that this third call would probably not be made, and I had hoped it would not.   But I am with you, and shall do my best; I have faith, too, in your ultimate success."

On January 26, 1891, the defendant, in reply to a letter of the 24th of January, received from the general manager, in which it was stated that "the amount of stock sold is $835,900, the balance is held in the treasury to meet contingencies, including the one referred to in your letter about R. Syndicate," wrote the following:

"*   *   *   And I can assure you that your agents here,

Warwick & Carson, assured us all that $700,000 had been taken by the Roanoke and Clarke & Co. syndicates, and their list shown us included that subscription, and it undoubtedly influenced me and others, as would naturally be the case. Now, you see the difference it makes is this: If that stock had actually been taken, this third call would not, in all probability, have been precipitated upon us now, for you would have had money enough. * * * I merely mention these things to show you that I am not a mere grumbler, and I mean to do my very best to advance the interest of the company, though I am surprised at these heavy calls rapidly made. * * *"

On January 29, 1891, he again wrote to the general manager, who had written to him on the 27th, and enclosed a statement showing how the moneys received had been disbursed and what the company still owed, as follows:

"Yours of 27th, with inclosed statement, received, for which accept my thanks. I shall use it to explain matters to our Richmond friends. I think if you would send out a circular, though, it would have a good effect. Of course there are some who are scared, and some who are reckless in their assertions. As for myself, I have the utmost confidence in the ability and integrity of the management, and make this statement to all my friends; and furthermore, if the enterprise does not make money for us, I shall lose confidence in my own judgment. * * *"

I have quoted thus fully from the letters of the defendant in error to show how unequivocally he elected, after he had acquired actual knowledge from official sources in the most direct and reliable way of the falsity of the alleged representation, to affirm his contract of subscription.

A contract induced by fraud is not void, but voidable at the option of the party injured by the fraud. Upon the discovery of the fraud, he has, as a general rule, the choice of two remedies: He may elect to rescind the contract, if he can restore what he has received in the same state or condition in which

he received it, and sue for and recover back the consideration he has paid or given, or, if he has not paid or given anything, repudiate the contract, and rely, when sued, upon the fraud as a complete defence; or he may elect to retain what he has received under the contract, and bring an action to recover damages for the injury he has sustained from the deceit. By adopting the latter course, he, in effect, affirms the contract, but not as made in good faith. He consents to be bound by its provisions, but does not thereby release or waive his claim for damages arising from the fraud collateral to the agreement. *Whitney* v. *Allaire*, 4 Denio 554; s. c., 1 Coms. 305; *Selway* v. *Fogg*, 5 M. & W. 86; *Clarke* v. *Dickson*, 96 E. C. L. R. 148; *Mateock* v. *Reppy*, 47 Ark. 148; *Herrin* v. *Libbey*, 36 Me. 357; *Bacon* v. *Brown*, 4 Bibb. 91; *Peck* v. *Brewer*, 48 Ill. 55; *Pearsoll* v. *Chapin*, 44 Pa. St. 9; *Gifford* v. *Carvill*, 29 Cal. 589; *Parker* v. *Marquis*, 64 Mo. 38; *Robinson* v. *Siple*, 129 Mo. 208; Tiffany on Sales, 119; and Bishop on Contracts, secs. 679 and 685.

If, however, the party who has been defrauded, elect, on the discovery of the fraud, to affirm the contract, his election is final and conclusive. He has but one election to rescind, and, having once elected to affirm the contract, he cannot thereafter disaffirm it, but must abide by the decision he has made. Bigelow on Fraud, 436; *Grymes* v. *Saunders*, 93 U. S. 55; *Dennis* v. *Jones*, 44 N. J. Eq. 513; *Hurt* v. *Miller*, 95 Va. 32; and *Hudson* v. *Waugh*, 93 Va. 518.

In *Ormes* v. *Beadel*, L. J. 1861, 30 Vol. (Eq.) 1, Lord Campbell said: "No case can be found to establish the doctrine that if a voidable contract is voluntarily acted upon, with a knowledge of all the facts, in the hope that it may turn out to the advantage of a party who might have avoided it, he may still avoid it, when, after abiding the event, it has turned out to his disadvantage."

The defendant contended, however, that he was not precluded from repudiating his contract of subscription by having

elected to affirm it after learning that the "Roanoke Syndicate" had only subscribed absolutely to $150,000 of the stock, and taken merely an option for $550,000 more, for the reason that the general manager, in informing him of the real nature of the subscription, withheld from him the terms of the option, and that he only learned of them some time thereafter from a member of the syndicate, and discovered the "bad judgment" displayed by the company in making such an agreement.

The substance of the fraud was the fact that the entire subscription of $700,000 was not *absolute*, as had been represented, but the greater part of it was merely *optional*. The "Roanoke" people had simply secured the right to take $550,000 more of the stock by a certain time, but were not bound to do so. This was the important and material matter. The defendant was only to be injuriously affected by their failure to elect to take it. It was the optional nature of the subscription that constituted the fraud, and gave to the defendant the right to rescind his contract. Knowledge subsequently acquired of the terms of the option was not the discovery of a new fraud. These were merely incidents of the same fraud, and their discovery did not revive a right of rescission that had been waived after the discovery of the essential fact that constituted the fraud. The subsequent discovery of a new incident in the fraud does not confer a new right to rescind, but merely confirms the previous knowledge of the same fraud. It is seldom that a party who is the victim of a fraud learns all its circumstances at the time he discovers the fraud. It is the fact of the fraud, as, in this case, the falsity of the representation with respect to the subscription of the "Roanoke Syndicate," which gives the right to avoid the contract, not the particular terms of the option. These do not change the essence of the fraud, nor affect the right of rescission. It was not necessary that the defendant in error should be apprised of all the incidents of the fraud before he could by the affirmance of his contract deprive himself of the right to rescind it. Knowledge of the

fraud itself was sufficient ground for the rescission of his con-
tract, and equally so for its affirmance.   Benjamin on Sales, (2
Amer. Ed. by Perkins,) sec. 452–53 ; 1 Addison on Con., sec.
312; *Campbell* v. *Fleming,* 28 E. C. L. R. 40; *Bach* v. *Tuch,*
126 N. Y. 53; and *Max Meadows L. & I. Co.* v. *Brady,* 92
Va. 79.

The defendant claimed the right to avoid his subscription
upon the further ground that he was also induced to subscribe
by the representation that Byrd Warwick and Fred. S. Myers,
who were well-known and prosperous business men of the
city of Richmond, had each subscribed to the stock of the
company to the amount of $10,000, when in fact they had not
done so, and their subscriptions were wholly fictitious.   In
this contention he is not sustained by the evidence.   It was
proved that their subscriptions were regular, and not made
upon any agreement or understanding whatever inconsistent
with their import, though for some reason not appearing in
the record they were subsequently allowed by the company to
withdraw their subscriptions.

But if it had been shown that their subscriptions were
fictitious or colorable only, and were made and used with the
intent to induce other persons to subscribe, with the secret
understanding that no liability should attach to them by reason
of their subscriptions, or that they should thereafter be allowed
to withdraw them, this could not have operated as a fraud
upon the defendant or injured him, for subscriptions made
under such circumstances are in the eye of the law as valid
and binding upon the subscribers as if they had been origi-
nally made in good faith, and will be upheld and so treated by
the courts.   2 Thompson on Corp., secs. 1404–06 ; 1 Morawetz
on Cor., sec. 107; and Taylor on Corp., secs. 105 and 521.

The defendant having, by affirmance of his contract of sub-
scription, precluded himself from thereafter rescinding or re-
pudiating it, the next inquiry is whether he could maintain his
cross-action against the company for damages for the deceit.

A person, who has been induced by fraud to enter into a contract, may, upon the discovery of the fraud, as we have seen, elect to rescind the contract and recover back the consideration he has paid or given, if he is able to restore in an unchanged state what he has received; or he may elect to retain what he has received and bring an action to recover any damages he has sustained by reason of the fraud. This is undoubtedly the rule with respect to contracts that pertain to goods and chattels, but it has been laid down as the law by the tribunal of last resort in England, the House of Lords, that a person who has been induced by the fraudulent misrepresentations of an agent of a company to take shares in it, cannot, after he discovers the fraud, elect to retain the shares and sue the company for damages.

In *Houldsworth* v. *City of Glasgow Bank*, 5 Appeal Cases 317, the distinction between contracts relating to goods and chattels and contracts of subscription to shares of stock was distinctly pointed out, and it was there decided, as was foreshadowed in the previous case of *Addie* v. *Western Bank of Scotland*, L. R., 1 Sc. App. 146, that a shareholder, who has been induced to purchase his shares by the fraud of an agent of the company, cannot maintain an action against the company for damages for the deceit, so long as he is a member of the company, upon the ground that such an action is at variance with the contract entered into by him with his fellow shareholders or partners in becoming a member of the company. The same principle was followed in *In re Addlestone Linoleum Co.*, 37 Ch. Div. 191.

The effect of these decisions is that if the shareholder is debarred from a rescission of his contract by the insolvency of the company, or from any other cause, he is without remedy against the company, and is left to his action against the agent who induced him by the fraudulent representation to subscribe for the stock. Benjamin on Sales (6 Am. ed.), secs. 705–9; Taylor on Corp., sec. 523; and 1 Cook on Stockholders, sec. 159, note.

Opinion.

A subscription to the capital stock of a joint-stock company is not only an undertaking to the company, but with all other subscribers. It is of the essence of the contract between the shareholders that they shall all contribute ratably to the payment of the company's debts and liabilities. The amount which each pays, or agrees to pay, for his stock is, by his contract of membership, dedicated to that end. If a subscriber, who has been induced by fraud to purchase his shares, elects after the discovery of the fraud to affirm his contract of subscription, he thereby, in effect, says: "Notwithstanding the fraud by which I was induced to become a member of the company, I shall still stand in with it, and take my chances." If he could thereafter maintain an action against the company for damages for the fraud, which, if right in principle, might go to the extent of allowing him to recover back by way of damages all that he had paid in on account of his shares, he would thereby *recoup* his entire loss; and, notwithstanding his election to retain his shares and to continue a member of the company, he would contribute, in fact, not one cent to the payment of the debts and liabilities. The effect, therefore, of allowing an action to be maintained by a shareholder against the company for fraud would be to throw the burden of the payment of the debts and liabilities on the other shareholders, who are as innocent of the fraud as he—a result which would be wholly at variance with his contract of membership.

The defendant in error, in consequence of having elected to remain a member of the company, could not thereafter maintain an action against it to recover damages for the alleged fraud.

Applying the foregoing principles to the case before us, it follows that the Circuit Court erred in its ruling upon the instructions to be given to the jury, and also in its ruling upon the motion for a new trial.

In reaching our conclusion the question of the constitutionality of the act of the General Assembly of December 19, 1895

(Acts 1895–6, p. 25), or of the act of December 22, 1897 (Acts 1897–8, p. 16), which was much argued at the bar, was not involved, and any discussion of it would be inappropriate, even if we could consider the latter act, but which could not be done, as it was enacted several months after the rendition of the judgment, and the writ of error must be decided according to the law as it was at the time that the judgment was rendered. *Anderson* v. *Hygeia Hotel Company*, 92 Va. 687.

The judgment of the Circuit Court must be reversed, the verdict of the jury set aside, and a new trial awarded, upon which new trial, if the evidence be the same, or substantially the same, as on the last trial, and instructions be again asked for, the jury are to be instructed in accordance with the views expressed in this opinion.

*Reversed.*