## 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### GATHRIGHT V. FULTON AND OTHERS.

#### November 15, 1917.

1. PARTNERSHIP—*Rescission—Rescission of Partnership Contract—Jurisdiction of Equity.*—A court of equity has jurisdiction to rescind and declare void *ab initio* a contract of partnership which has been procured by fraudulent representations. But the principles and the terms upon which equity will rescind a partnership contract for fraud are the same as those upon which other contracts may be rescinded for that cause.

2. FRAUD AND DECEIT—*Rescission—Contracts.*—Fraud does not render contracts and other transactions absolutely void but merely voidable, so that they may be either affirmed or repudiated by the party who has suffered the wrong. If he elects to repudiate and to seek for a remedy, then equity proceeds upon the theory that the fraudulent transaction is a nullity; and it administers relief by putting the parties back into their original position as though the transaction had not taken place and by doing equity to the defendant as well as to the plaintiff.

3. PARTNERSHIP — *Fraud and Deceit — Partner Obtaining Secret Profit—Remedy—Accounting on Dissolution—Case at Bar.*—Appellant secured an option to buy a tract of real estate for $30,000, which he attempted to sell appellees for $35,000. Appellees were unable or unwilling to buy the property alone, although it did not appear that they regarded the price as too high. Appellees, however, finally agreed to buy the property jointly with appellant for $34,000, each of the parties to own one-third of the property and bear one-third of the cost. Appellant represented to appellees that the option price was $34,000 and that it was the lowest price for which the property could be obtained, and that appellant had paid $1,000 to the owner of the property for the option. These representations were wholly untrue. Appellees learning of the false representations of appellant, and being otherwise dissatisfied with him, brought suit asking for a rescission of the partnership agreement and for the elimination of appellant from all connection with the ownership or management of the property. They did not ask to be restored to their former condition, but indicated plainly that they were averse to having the controversy disposed of by

3

the usual process of restitution and the restoration of their former status. The case which they made out was one in which they have acquired in a partnership transaction interests in a property which they wish to keep, but in connection with the acquisition of which one of their partners took an unfair advantage and made a secret profit.

*Held:* That, appellees having unequivocally asserted the purpose of holding on to the fruits of their contract with appellant, they could not now, if they desired, be heard to ask for a recission *ab initio,* and a restitution from him; that, the only way to afford appellees relief for fraud of appellant is to dissolve the partnership; and, under the prayer for a settlement of accounts and for general relief, an account should be made up according to the usual and established method of settling a partnership on a dissolution, placing the first cost of the farm at $30,000, and denying appellant the $4,000 profit which he undertook to make off of his partners. The net assets after payment of the debts, if any, and the payment to each partner of what he is entitled to receive for his cash contribution to the enterprise, should be equally divided among the three partners.

4. PARTNERSHIP—*Dissolution—Disposition of Assets.*—Unless the parties agree upon a division in kind, the distribution of the assets between the partners upon dissolution should be made by selling all the partnership property, both real and personal, and dividing the net proceeds. For neither party has a right to compel a division of the specific subject in kind, or require the other to accept what, according to a valuation, his interest may be worth. Equity always directs the value of the subject to be ascertained in the way in which it can be best ascertained, by sale and conversion into money.

Appeal from a decree of the Corporation Court of the city of Staunton. Decree for complainants. Defendant appeals.

*Reversed.*

The opinion states the case.

*J. M. Perry* and *George A. Revercomb,* for the appellant.

*H. H. Byrd* and *Wm. M. McAllister,* for the appellees.

KELLY, J., delivered the opinion of the court.

The essential facts in this case, established, not without some conflict of testimony, but as we conceive by the clear weight of the evidence, are as follows: T. M. Gathright procured from W. M. McAllister an option to purchase, at the price of $30,000, certain real estate known in the record as the "Fort Dinwiddie Farm." This option was dated June 6, 1912, and expired in thirty days from its date, but subsequently, on January 6, 1913, Gathright obtained from McAllister a second option upon the property at the same price. This second option was for a period of only nine days, and under it the purchase involved in this case was made. In the interim, however, between the expiration of the first and the execution of the second option, Gathright had verbal assurances from McAllister which led him to believe that if he could produce a purchaser McAllister would make the sale upon the terms named in the options.

It was not Gathright's purpose to acquire this farm as his own, but to sell it to some third party at an advance over the option price. To this end he brought the property to the attention of Dr. Z. M. K. Fulton and Dr. Edward S. Gifford, both of Philadelphia, pricing it to them at $35,000. They were attracted by the proposition, and it does not appear that they regarded this price as too high, but they were either unable or unwilling to undertake the purchase alone. After various unsuccessful efforts to interest other Philadelphia friends in the project with them, they entered into negotiations with Gathright looking to a joint purchase of the property with him, each of them to own one-third and each to bear one-third of the cost, including the necessary outlay to equip and operate the farm. During the course of these negotiations Gathright represented to Fulton and Gifford that McAllister's lowest price was $34,-000; and he further represented to them that he had paid

McAllister $500 for the original option and a like sum for the second option. These representations were wholly untrue. McAllister's price all the while had been $30,000, and Gathright had not paid him any sum whatever for either of the options.

On or about the 14th of January, 1913, the parties entered into a contract, which, so far as it need be quoted here, was as follows:

"This contract, made and entered into this 14th day of January, 1913, between T. M. Gathright, of the first part, and Z. M. K. Fulton and E. S. Gifford, of Philadelphia, of the second part, Witnesseth: That the said T. M. Gathright has contracted for the purchase from W. M. McAllister of his farm. * * * And the said T. M. Gathright hereby agrees and binds himself to sell to said Fulton and Gifford at the price of $34,000, and the said Fulton and Gifford hereby agree to purchase said farm from said Gathright and agree to pay the said purchase money in the following instalments: $9,000 to be paid in cash on the execution of this contract, $10,000 to be paid on or before the 15th day of February, 1913, and the residue of the purchase money, $15,000 to be paid in two equal instalments, payable in one and two years * * * and when the said $10,000 is paid, on or before the 15th of February, 1913, the said Gathright agrees to have the said McAllister to convey the said property to Fulton and Gifford by deed * * * in which deed Gathright and wife will unite for the purpose of conveying any interest they may have in same."

Gathright undoubtedly led Fulton and Gifford to believe, and they did believe, that the foregoing contract embodied the price and terms contained in the McAllister option.

Under date of January 15, 1913, Gathright wrote to Fulton and Gifford a letter, the substance of which appears from the following extract:

"Referring to our sales contract of this date, and in order to set forth our respective interests, intentions, in agreement, I am writing this letter in triplicate with place for your signatures approving the same, which will constitute a contract between ourselves:

"In the sales contract to you I have this day signed, I acknowledge receipt in the same for $9,000 and am giving you separate receipts for $3,250 each, making $6,500, the difference of $2,500, being the amount of my payment on my interests that I am to have in this farm or in our company when we get our charter and organize.

"It being understood by and between us that I am to pay in one-third of the total purchase money and one-third of whatever additional amount that may be found necessary or advisable for the stocking and operation of the place. In other words, I am to pay in one-third of the capital stock that we may issue and each of you gentlemen to do likewise.

"It is understood between us that in the first payment I am not putting up my proportion, but that I am to make up this difference so that my payment will equal that of each of you by May the 15th, 1913, and that my payment on or before February the 15th, 1913, shall be not less than $3,333.33 in addition to what I have already paid.

"It is understood between us that when the $10,000 payment is made on or before February the 15th, 1913, by we three as above that the property shall be deeded to Z. M. K. Fulton and E. S. Gifford, and as soon thereafter as possible we are to organize and issue stock for the respective amounts that may have been paid in by us at that time you two are to make deed conveying this property to our company.

"The name of which shall be mutually agreed upon before that time, it being thought advisable by us now to incorporate under the name of 'Fort Dinwiddie' Farms."

This letter was signed by Gathright and by Fulton and Gifford, and constitutes what is referred to in the record as the partnership agreement, the contract first above mentioned being known as the sales contract. While these contracts bear different dates, there can be no question at all about the fact that they are, and were intended by the parties to be, inseparably connected, and to be read together as evidencing the entire contract between them. It may be here added that the parties applied for and obtained a charter for the corporation proposed in the partnership contract, but the organization of the corporation thereunder was never completed.

The $2,500 mentioned in the partnership agreement as being the amount of Gathright's first payment on the purchase was not paid by him. According to previous written and verbal statements which he had made to his associates, this payment was to consist of $1,000 which he claimed to have previously paid to McAllister, and $1,500 cash which he claimed he was to pay at the time the option was closed. As a matter of fact, however, he had not, as we have seen, paid $1,000 or any sum to McAllister, and instead of paying $1,500 of his own money at the time the option was closed, he appropriated to his own use $1,500 of the $6,500 which his associates were putting up, and paid only the residue, $5,000, to McAllister, that sum, instead of $9,000, being the cash payment actually required under his option with McAllister. His partners had never seen the option.

On or about February 15, 1913, Fulton and Gifford and Gathright each paid to McAllister one-third of the $10,000 due on that day, and thereupon McAllister delivered to Z. M. K. Fulton a deed for the farm, taking Fulton's two notes for $7,500 each and reserving a lien upon the property. This deed did not disclose the true consideration, and it was not until some time later, after Fulton and Gifford had

become dissatisfied with Gathright's conduct in connection with the management of the farm (a service which he was to render for the first year without compensation) that they instituted some inquiries which resulted in apprizing them of the deception he had practiced upon them in respect to the purchase money. The deed was made to Fulton alone, as a matter of convenience, and for the benefit of himself and Gifford and Gathright.

When the deed was delivered, Gathright was put in full charge and control of the farm as manager, and so remained until the fall of 1913, when the personal relations between him and Fulton and Gifford had become seriously strained, and he was practically discharged from the management.

After discovering the true state of facts as to the contract between Gathright and McAllister, Fulton and Gifford confronted him with a charge of bad faith. He inquired of them at that time whether, in case he should then make up the amount which they claimed he had fraudulently worked into the price of the place, they would be satisfied and would allow their relations to continue as theretofore, and they replied in the negative. They did, however, on that occasion, agree verbally to allow Gathright thirty days in which to sell the farm, exclusive of live stock and equipment, for $40,000, and it appears from the evidence that, if he had made the sale at that price, the net proceeds would have been equally divided among the three after the repayment to each of the actual cash advanced by him. Gathright did not produce the purchaser, and on September 30, 1913, Fulton and Gifford wrote Gathright as follows: "As the thirty days you asked for to sell Fort Dinwiddie Farm have expired and you have not made the sale, we hereby notify you that we have engaged Mr. W. M. McAllister as our attorney, with authority to terminate our business relations with you." It

was at this time that Fulton and Gifford took possession of the farm and continued to operate and control the same through their own foreman until the receivers were appointed in this cause.

In June, 1914, Fulton and Gifford filed their bill against Gathright, charging him with false and fraudulent representations with reference to the productiveness of the farm, and particularly with reference to the contract price, and with infidelity and misconduct as manager. In this bill they charge also that he was acting as their agent and partner in closing the purchase from McAllister, and they pray that the court will require a full settlement of all transactions between them and Gathright; that the written partnership agreement be declared null and void because of the fraud in its procurement; and that the court "will grant a rescission of the said supposed partnership agreement, and a like rescission of said supposed contract of sale, and eliminate the said T. M. Gathright from all connection with the ownership or management of any of said property; that they be permitted to remain and continue in the operation and control of all the said affairs until the future order of the court; and that if the court deem it wise or proper to appoint a receiver to manage the affairs, that one be appointed by the court for that purpose." The bill also contained the usual prayer for general relief.

There was a demurrer to the bill, which was sustained with leave to amend; and also a demurrer to the bill as amended in accordance with such leave, the latter demurrer being overruled by the trial court. In the view which we take of the case, however, it will not be necessary for us to consider the demurrers and the assignments of error to the rulings thereon.

Gathright filed an answer in which he denied the allegations of fraud and undertook to defend the course which he had taken in withholding from them the true facts with

reference to the consideration, claiming in the answer that he had the right to make a profit in the transaction, and that they were possessed of sufficient facts to charge them with notice that he was making a profit.

Before the suit of Fulton and Gifford against Gathright was matured for final hearing, Gathright, in October, 1914, filed his bill against Fulton and Gifford, setting out his version of the transaction and alleging that the complainants were improperly cutting timber on the farm, and in this bill he prayed for a partition of the farm and personal property, or for a sale thereof, if partition in kind could not be conveniently made, that proper accounts might be taken and for general relief. Fulton and Gifford answered this bill, setting out practically the same matters contained in their original bill against Gathright.

These two causes came on to be heard together on the 27th of January, 1916, when the court entered the decree which is the subject of this appeal. That decree rescinded the sales contract and the partnership contract, declaring the same null and void, decreeing that Fulton and Gifford should pay the receiver, who had theretofore been appointed to take charge of the farm pending the litigation, the sum of $3,333.33, with interest from February 17, 1913 (the exact date on which Gathright had paid that sum to McAllister), and $499.66 (on account of certain personal property which Gathright had purchased for the farm), with interest from October 15, 1913, and that "upon the payment of said sums, with accumulated interest, subject to the aforesaid $1,500 payment (the money of Fulton and Gifford which he had used) the entire interest of Gathright in the Fort Dinwiddie Farm and the personal and mixed property thereof shall cease and determine." The decree further directed the receiver theretofore appointed to pay the costs of the two causes out of the payments above mentioned, and to pay the residue to Gathright, and

then to convey all the right, title and interest of Gathright in the property to Fulton and Gifford, share and share alike.

There is no question whatever about the jurisdiction of a court of equity to rescind and declare void *ab initio* a contract of partnership which has been procured by fraudulent representations. *Oteri* v. *Scalzo,* 145 U. S. 578, 12 Sup. Ct. 895, 36 L. Ed. 824, 827; Mechem's Elements of Partnership, section 251; Lindley on Partnership, 482; Story on Partnership (7th ed.), section 285; 3 Min. Inst. (2nd. ed.), p. 703.

But the principles and the terms upon which equity will rescind a partnership contract for fraud are the same as those upon which other contracts may be rescinded for that cause. In discussing the general subject of relief in equity against fraudulent transactions, Mr. Pomeroy, under the head of "Incidents of the Jurisdiction and Relief," says: "1. Fraud does not render contracts and other transactions absolutely void but merely voidable, so that they may be either affirmed or repudiated by the party who has suffered the wrong. 2. If he elects to repudiate and to seek for a remedy, then equity proceeds upon the theory that the fraudulent transaction is a nullity; and it administers relief by putting the parties back into their original position as though the transaction had not taken place and by doing equity to the defendant as well as to the plaintiff." 2 Pomeroy Eq. Jur. (2d ed.), section 915. See, also, to the same effect, *Wilson* v. *Hundley,* 96 Va. 96, 100, 30 S. E. 492, 70 Am. St. Rep. 837. The authorities supporting the jurisdiction of equity to declare partnership contracts void *ab initio,* do not go as far as we are asked to go in the instant case; indeed, they do not apply at all to the case we have here, as made by the pleadings and the proof. These authorities, on the contrary, contemplate cases in which the partner or partners complaining are seeking a restora-

tion of their former status and asking to be eliminated entirely and *ab initio* from the transactions complained of. The complainants in this case not only failed to ask in their bill to be restored to their former condition, but they indicate plainly in their allegations, and they state still more plainly in their depositions, that they are averse to having the controversy disposed of by the usual process of restitution and the restoration of their former status. They state distinctly that they are unwilling to give up the property, even if Gathright should refund to them, with interest, every cent of money which they have invested in the partnership venture. It does not seem to us from their bill, especially when viewed in the light of their testimony, that they make out any other case than one in which they have acquired in a partnership transaction interests in a property which they wish to keep, but in connection with the acquisition of which one of their partners took an unfair advantage and made a secret profit. There is no serious claim that they were otherwise injured in the original transaction, and this deception is the sole ground upon which they are entitled to any relief. The charges as to misrepresentation of the productiveness of the farm go for naught in the face of their unwillingness to give up the property and get back the money which they have put into it. The allegations of improper conduct and mismanagement on the part of Gathright while he had charge of the farm, do not appear serious in the light of the evidence, and do not seem to be relied upon at this time; and if they were relied upon, they could not, of course, be made the basis of a decree for the cancellation of the original contracts, since they deal with matters arising subsequently.

The deception which Gathright practiced upon them with reference to the price is clearly established and cannot be defended in morals or in law; but the measure of the penalty which we can impose upon him, and the relief which

we can afford to the complainants on account thereof, must be determined by the established equitable principles applicable to such cases. They claim to be justified in asking to turn him out of the partnership without allowing him any share in the property, on the ground that he did not have any interest in the property at the outset; but they themselves had no interest therein and no contract with McAllister, and the title interest which they at this time have in the property is due, as they clearly allege and prove, to his service and to his contract with McAllister. Whatever rights they have in the property they acquired through their association with him, and it is impossible, so far as he and they are concerned, to separate the sales contract and the partnership contract from their purchase of the land. They cannot claim under these contracts and against them at the same time. 2 Pom. Equity Jur., section 916, note 4, and cases cited.

Having unequivocally asserted the purpose of holding on to the fruits of their contracts with Gathright, they could not now, if they desired, be heard to ask for a rescission *ab initio,* and a restitution from him. They must accept the relief appropriate to the case which they have made.

The fraud which they have discovered and unmistakably fastened upon Gathright, and the resulting destruction of their confidence in him, entitle them to a termination of their partnership relations with him. 2 Lindley on Partnership, p. 580; 30 Cyc. 657, and authorities cited in note 19. The only feasible and the only just way to afford them this relief, in view of the position which they have assumed, is to dissolve the partnership. The bill filed by them, as well as the bill filed by Gathright, contains a prayer for a settlement of accounts and for general relief. The parties have all invoked the aid of equity in the settlement of their differences, and while neither of them can be accorded the

special relief for which they pray, the court ought to and will enter the decree shown to be proper upon the whole case, and thus promote the sound policy of reaching as promptly as justice will permit the end of the countroversy.

The decree complained of will be reversed, and this court will enter a decree dissolving the partnership and remanding the cause to the corporation court for a settlement. The account should be made up according to the usual and established method of settling a partnership on a dissolution placing the first cost of the farm at $30,000, and denying Gathright the $4,000 profit which he undertook to make off of his partners. The net assets after payment of the debts, if any, and the payment to each partner of what he is entitled to receive for his cash contribution to the enterprise, should be equally divided among the three partners. This distribution, unless the parties agree upon a division in kind, should be made by selling all the partnership property, both real and personal, and dividing the net proceeds. "For neither party has a right to compel a division of the specific subject in kind, or require the other to accept what, according to a valuation, his interest may be worth. How (on Partnership) 257. Equity always directs the value of the subject to be ascertained in the way in which it can be best ascertained, by sale and conversion into money." *Pierce* v. *Trigg,* 10 Leigh (37 Va.) 423, 440; Story on Partnership (7th ed.), p. 542, section 350; Ludley on Partnership, p. 555; Bispham's Eq. (6th ed.), section 514.

In the meantime, the receivership heretofore decreed in the cause, should be continued under the direction of the corporation court, until the property is disposed of by mutual agreement or by sale as above indicated.

*Reversed.*