## Richmond

PEARL H. POE, L. S. DANIEL, INCORPORATED, AND H. K. SMITH
v. EDWARD C. VOSS AND FRANCES G. VOSS.

March 7, 1955.

Record No. 4329.

Present, Hudgins, C. J., and Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*Lyne & Bowles* and *Carneal & Smith,* for the plaintiffs in error.

*Cary L. Branch,* for the defendants in error.

HUDGINS, C. J., delivered the opinion of the court.

Edward C. Voss and Frances G. Voss, his wife, instituted this action of fraud and deceit to recover damages for alleged misrepresentations that induced them to buy a house and lot owned by Pearl H. Poe and sold to them through H. K. Smith, an employee of L. S. Daniel, Incorporated, a real estate broker. The trial court, after amending the verdict returned by the jury, entered judgment for plaintiffs.

Appellants, defendants in the trial court, will be designated collectively as vendors, and appellees, plaintiffs in the trial court, will be designated as vendees.

The facts are that Mrs. Poe owned a large residence, #3507 Chamberlayne Avenue, in the City of Richmond. The residence was heated by a steam coal-fired furnace. In the early fall of 1952 an explosion seriously damaged the boiler to the furnace. Thereafter a plumber employed by Mrs. Poe informed her that the furnace could not be operated unless substantial repairs were made, and advised her to install a new furnace. Prior to the trouble with the furnace she had listed the property for sale at $20,000.00. Later she reduced the price to $17,500.00 and informed the broker that there was something wrong with the furnace, that she was not financially able to repair it, nor was she physically able to keep the Iron Fireman stoker, which held from 350 to 400 lbs. of coal, filled, and that the house was too large for her to maintain.

On December 4, 1952, Edward C. Voss dialed a telephone number he saw in a Richmond newspaper advertising "A large home in the Ginter Park area for sale." Smith, the agent, answered the telephone and started to describe the house. Voss stopped him and said that he knew the house, that he had examined it twice within the past two years with the view

of buying it. According to Voss's version of this telephone conversation, Smith told him that if he would act at once he could buy the property for $15,750.00. On the next day, December 5, 1952, Voss and his wife met Smith on the premises. During an inspection of the building, according to Voss, he said to Smith: "This house is like a tomb. It is cold. What is wrong with the furnace?" Smith replied: "Nothing. I will explain it to you later." It seems that at this moment Mrs. Poe's daughter was within hearing distance of the parties. Voss testified that after she left Smith said: "I didn't want to embarrass Mrs. Poe's daughter in front of you, but the facts of the matter are, number one, Mrs. Poe is financially unable to keep this furnace up. Except when her daughter is here she works all day. She leaves the house early in the morning and she doesn't return until night, and you will see when you go downstairs she has very adequate heating facilities for the portion that she is living in, and she is also physically unable after working all day to fill the hopper on that Iron Fireman." Voss also testified that they discussed the age and make of the furnace, and that Smith told him the furnace was in good shape and did not seem too old, and said that Mrs. Poe had told him there was something wrong with the controls, but he (Smith) did not know what was wrong.

On the same day the vendee signed a contract offering to buy the property for $15,750.00, gave a check for $100.00, agreed to pay $1,900.00 additional within thirty days and to assume the payment of the existing deed of trust on the property or to refinance the balance of the purchase price in a manner acceptable to the vendors. On December 8, 1952, Mrs. Poe accepted the offer and, on December 29, 1952, thereafter, Voss paid the $1,900.00 and made satisfactory arrangements for the payment of the balance of the purchase price.

Later the vendees ascertained that there were large cracks in the boiler to the furnace and were advised by several experts, whom they had asked to bid on the repair of the furnace, that it was in bad shape, that it could be repaired at a cost of $300.00, but even if the needed repairs were made it

was doubtful whether it would operate satisfactorily. All advised installation of a new furnace. The vendees acted upon this advice and installed a new furnace at a cost of $850.00. Their claim upon the vendors for reimbursement of this expenditure was refused. This action followed.

Smith's testimony is that on December 4, 1952, he informed Voss over the telephone that the price of the property had been reduced from $20,000.00 to $17,500.00 and that it was possible that he could buy it at less than that. After Voss and his wife had fully inspected the premises he asked Smith "How much less than $17,500.00 do you think I could buy it for?" He replied: "Mr. Voss, that is what I can't tell you." Voss then said: " 'The furnace ain't in operation and I don't know what is going to happen there.' Then I said: Neither do I. I then told Voss that if he would make an offer of $15,750.00, perhaps, I could get Mrs. Poe to accept it and, if so, he could have the old furnace repaired or a new furnace installed which would give him the property at less than $17,500.00 . . .", the price Mrs. Poe was asking for it.

The only material difference between Voss's and Smith's testimony is that Voss claims Smith told him there was something wrong with the controls, he did not know what, while Smith's testimony is that he told the vendee there was something wrong with the furnace, he did not know what. After the vendees had signed the contract, knowing that the furnace was not in condition to operate, they asked Smith to let Voss have a key to the house so that he could have the furnace examined by a disinterested third party. Smith complied with this request and on the appointed day met Voss and his friend, Robert W. Bailey, on the premises where both Voss and Bailey were given every opportunity to make a thorough examination of the furnace. Voss and Bailey were evasive in their testimony as to the purpose for which Bailey was asked to inspect the furnace. However, a fair inference from their testimony is that Bailey, at Voss's request, went on the premises for the specific purpose of ascertaining just what was wrong with it. They testified that Bailey made only a super-

ficial examination and advised Voss that the controls could be repaired at a nominal expense and that if the ashes and soot were removed by a vacuum cleaner the furnace would work. Thereafter, the vendees performed the contract by paying the $1,900.00 in cash and making satisfactory arrangements to secure the payment of the balance of the purchase price.

Sometime after this settlement Bailey reported to the vendees that on vacuum cleaning the furnace as they had authorized him to do he found that it "had a great big crack in it . . . all down the center." Voss testified that this was the first time he knew the true condition of the furnace and he asked Smith to contact Mrs. Poe in order that a financial adjustment might be made between the parties. This was not done, at least no settlement was made.

The parties differ as to whether Smith's alleged statements as to the condition of the furnace or the controls were mere expressions of opinion or were statements of a material fact.

█ It is regarded as fundamental that fraud cannot be predicated upon what amounts to a mere expression of an opinion. *Henning* v. *Kyle*, 190 Va. 247, 56 S. E. (2d) 67, and authorities therein cited. *Blackman* v. *Howes*, 82 Cal. App. (2d) 275, 185 P. (2d) 1019, 174 A.L.R. 1004, Ann. p. 1012. It is not always easy to determine whether a statement is one of opinion or one of fact. In deciding the question, the subject matter, the form of the statement, the attendant circumstances, and the knowledge of the parties must be considered. What is susceptible of exact knowledge when the statement is made is usually considered as a matter of fact. However, as we view the case, it is unnecessary to determine this issue.

█ Even if it be conceded that Smith told the vendees there was something wrong with the controls, he did not know what, these statements, when considered with all other facts and circumstances disclosed by the record, are insufficient to support the action.

Voss was familiar with the house and lot. He had inspected it twice before December 5, 1952. It was obvious

that the house and furnace were old. Plaster had become loose and four rooms needed to be replastered. The pipes to the furnace were old and rusty and, as Voss said, "would certainly need replacing in a considerably short length of time." The furnace was not in operation and he knew there was something wrong with it or its controls. Ashes and soot had accumulated in the firebox and flues. While the cracks in the furnace were not obvious unless the inside was examined with a flashlight or an electric light, the boiler was connected with the water system and if the water had been turned on it would have leaked through the cracks. Stains of muddy water were visible on top of the boiler and on the ceiling over it. According to part of Smith's testimony, which is not expressly denied, he called Bailey's attention to this, whereupon Bailey said: " 'That is from overheating and the relief valves put that up there', and he started to turn the water on. I says: Mr. Bailey, wait a minute. I have no objection to your turning the water on and firing the furnace up, but you will have to be responsible because Mrs. Poe told me she was not going to do anything to the furnace, anything to the stoker in any way, shape, form or fashion. Bailey said: 'That is all right. I can fix it in a couple of hours. I don't see anything critically wrong with it.' "

The obvious condition of the furnace and Smith's statements, even if we accept the vendees' version of what they were, were sufficient to excite the suspicions of a reasonably prudent man, and they did, for the vendees asked for and were given opportunity to make a full and complete examination of the true condition of the house and the furnace. Under these circumstances it was the vendees' duty to take advantage of the opportunity and ascertain the true condition of the premises and, having failed to do so, they cannot now avail themselves of the alleged misrepresentations. *Rothermel* v. *Phillips*, 292 Pa. 371, 141 A. 241, 61 A.L.R. 489, Ann. p. 513; *Costello* v. *Larsen*, 182 Va. 567, 29 S.E. (2d) 856. See *Henning* v. *Kyle, supra,* and cases therein cited.

In *West End Co.* v. *Claiborne*, 97 Va. 734, 751, 34 S. E.

900, Judge Keith, speaking for the Court, said: "The principle is equally well settled, but somewhat more difficult of application in practice, that a party induced to enter into a contract by misrepresentation must be justified in relying upon it under all the circumstances. If, after a representation of fact, however positive, the party to whom it was made institutes an inquiry for himself, has recourse to the proper means of obtaining information, and actually learns the real facts, he cannot claim to have relied upon the misrepresentation and to have been misled by it. Such claim would simply be untrue. The same result must plainly follow when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts, when his attention is directed to the sources of information, and he commences, or purports, or professes to commence, an investigation. The plainest motives of expediency and of justice require that he should be charged with all the knowledge which he might have obtained had he pursued the inquiry to the end with diligence and completeness. He cannot claim that he did not learn the truth, and that he was misled. . . ."

In *Crebs* v. *Jones*, 79 Va. 381, 384, it is said: "The inquiry then is, whether the conveyance sought to be set aside was obtained by fraud or misrepresentations, as alleged in the bill. And here it is hardly necessary to repeat what is so often said that fraud is never presumed. It must not only be alleged, but it must be strictly and clearly proved as alleged, otherwise relief will be denied, notwithstanding the party against whom relief is sought may not have been perfectly clear in his dealings. . . ."

For the foregoing reasons the judgment will be reversed, the verdict set aside, and final judgment rendered for vendors.

*Reversed and final judgment.*

BUCHANAN and SMITH, JJ., dissenting.

BUCHANAN, J., dissenting:

I agree with the conclusion that the evidence in this case does not support the items in the verdict of $250 for loss of use of the house and $250 for punitive damages against H. K. Smith.

I disagree with the conclusion that there can be no recovery on account of the furnace.

The plaintiffs based their action upon the charge that the defendants had represented to them that the furnace in the house was in good condition; that the plaintiffs relied on that representation; that the representation was false; that the furnace was cracked and worthless, as the defendants well knew, which necessitated the installation of a new furnace, causing damage to the plaintiffs.

If the plaintiffs proved that case, and the jury have said they did, then the plaintiffs were entitled to recover. In *Jefferson Standard Ins. Co.* v. *Hedrick*, 181 Va. 824, 833-4, 27 S. E. (2d) 198, 202, this was stated to be the rule long adopted and approved in Virginia:

" 'The law is well settled that if one represents as true what is really false, in such a way as to induce a reasonable man to believe it, and the representation is meant to be acted on; and he to whom the representation is made, believing it to be true, acts on it, and in consequence thereof sustains damage, there is such fraud as will support an action for deceit at law, or a bill for rescission of the transaction in equity. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case the fraud is constructive; in the other it is actual.' "

See also *Westover Court Corp.* v. *Eley*, 185 Va. 718, 40 S. E. (2d) 177.

There was some conflict in the evidence as to what representations were made, but it was the function of the jury, not ours, to settle the conflicts, and they believed the evidence of the plaintiffs.

Plaintiff Voss testified that when he and Mrs. Voss went

with defendant Smith, the real estate agent, to look at the house in December, 1952, the house was cold and he asked Smith what was wrong with the furnace. Smith said nothing was wrong and later explained that Mrs. Poe was not financially able to operate it. "Mr. Smith told me specifically that there was nothing wrong with the furnace."

Again Voss said when they went down to the basement on that occasion he opened the furnace door and looked inside but it was dark and the inside was covered with ashes and soot so he could not tell anything about it, and at that time Smith repeated that "the furnace was in good shape and that it was a good standard make;" that Smith said Mrs. Poe had told him there was something wrong with the controls, that it cut on and off at the wrong time, but Voss testified there was nothing in what he saw or heard that indicated there was anything wrong with the furnace itself, "Not one single whisper."

Voss further testified that sometime afterwards he told Mrs. Poe that Smith had said something was wrong with the controls and he asked her what she had done to find out what the trouble was; that Mrs. Poe replied that she had had a furnaceman or plumber look at it and he could find nothing wrong, and that there was nothing wrong with the furnace.

Mrs. Voss corroborated her husband's testimony.

According to the plaintiffs' evidence these statements by Mrs. Poe and her agent Smith were untrue, and known by them to be untrue. They were made in December, 1952, and some weeks prior thereto there had been an explosion in the furnace. Mrs. Poe had called a plumber to see about it. The latter testified that apparently the furnace had frozen, the sections were broken and would not hold water, and it was damaged to such extent that it would cost more to repair it than to replace it. He said that the defects could not have been seen without a light being put inside or the water being turned on, which the average layman would not have done, "You have to get in the furnace and find out what is wrong. You can't just walk up and tell. You have to inspect it all over."

Another plumber testified that Mrs. Poe called him to come out there, that there had been an explosion that jarred the house; that he examined the boiler "and found that it was cracked in the arch in the boiler, and it looked like approximately two of the sections were busted." He told her the best thing to do was to put in a new boiler; that it would cost about $300 to make repairs and he could not guarantee the result.

The jury could believe from the evidence that the plaintiffs relied on these assurances of Mrs. Poe and her agent that the furnace was in good condition and that they did not rely on any independent investigation. The evidence shows that Voss asked Bailey, an officer in a fuel company, to advise him what kind of coal was needed for the furnace and to see what was wrong with the controls. Bailey testified that this was the only purpose of his visit; that he turned the stoker on and found that it worked, but he told Voss he could not check the control because it wasn't operating, "and if there was anything wrong with the controls they could be repaired at a nominal fee." He recommended that the furnace be vacuum cleaned. This was done and the defects were then disclosed to the plaintiffs for the first time. Plaintiffs' evidence was that it was after Christmas, 1952, when they were informed of the true condition of the furnace. The purchase transaction seems to have been completed on December 29, 1952. The jury could have found from the evidence that the defects were not discovered until after this closing date. But if they were discovered before that time, the plaintiffs still had the right to elect to take the property under their contract and bring their action for the deceit. *Wilson* v. *Hundley*, 96 Va. 96, 30 S. E. 492.

The court properly instructed the jury that the measure of plaintiffs' damage was the difference between the value of the property as it was and as it was represented to be, and it is clear that that is what the jury found in the item of their verdict "$500.00 for furnace of equal value." The plaintiffs were suing for damage because of the condition of the fur-

nace, not of any other part of the house. The evidence in the case related only to the furnace. Surely they could prove the damage they claimed by direct evidence about the furnace rather than by the indirect and awkward way of proving what the whole house was worth as it was and as it was represented to be. On the pleadings and the evidence the only question at issue was the damage suffered as measured by the difference in the value of the furnace as it was and as it had been represented to be. The $500 found by the jury in response to that issue was supported by the evidence and in my opinion the judgment below should be affirmed to that extent.

SMITH, J., joins in this dissent.