**CARIBBEAN STEAMSHIP COMPANY,**
S.A., and Reynolds Jamaica Mines, Ltd.,
a Delaware corporation, Plaintiff,

v.

**LA SOCIETE NAVALE CAENNAISE,**
Defendant.

No. 348.

United States District Court
E. D. Virginia,
Newport News Division.
April 12, 1956.

Seawell, Johnston, McCoy & Winston,
Norfolk, Va., Walter L. Rice and W. To-

bin Lennon, Richmond, Va., Harry E. McCoy, Jr., Norfolk, Va., for plaintiff.

Vandeventer, Black & Meredith, Norfolk, Va., Braden Vandeventer, Jr., Norfolk, Va., for defendant.

HOFFMAN, District Judge.

A review of the pleadings, exhibits, testimony taken in open court, admissions of counsel in oral argument and briefs filed herein, reveals the following pertinent facts for determination of the issues submitted on defendant's motion for summary judgment touching upon the jurisdiction of this Court.

The steamship Astree, more recently called the Dragon, was constructed by the French Government in 1943, at North Vancouver, British Columbia, as a French collier. The defendant, La Societe Navale Caennaise (hereinafter referred to as "S. N. C." or "seller"), had a representative present in Canada during the shipbuilder's trial and tests and, upon completion of the vessel, took possession at Vancouver and navigated the same to France. Since that date "S. N. C." retained custody of the vessel until its ultimate delivery to one of the plaintiffs herein, Caribbean Steamship Company, S.A., a Panamanian corporation, in June, 1952, at Rouen, France.

On April 26, 1952, Reynolds Jamaica Mines, Ltd., a Delaware corporation (hereinafter called "Mines"), entered into a contract with "S. N. C." at Paris, France, to purchase the Astree for the principal sum of $1,200,000 with $810,000 (including interest) being deferred as to payment for a period of 90 days from June 16, 1952. The original contract provided that "Mines" would cause the formation of a company under the laws of Panama for the purpose of taking title to the vessel, thus bringing about the organization of Caribbean Steamship Company, S.A. (hereinafter referred to as "Caribbean"). "Mines" remained liable on the contract despite the designation of "Caribbean" as the purchaser. Both "Mines" and "Caribbean" are wholly owned subsidiaries of Reynolds Metal Company, a Delaware corporation (here-inafter designated as "Reynolds"). "Mines" and "Reynolds" maintain their offices and principal places of business in Richmond, Virginia. The officers and directors of "Mines", "Reynolds" and "Caribbean" are substantially identical.

Thereafter, on May 26, 1952, an addendum to the original contract was executed in Paris by "S. N. C.", "Caribbean" and "Mines", with the purchaser being designated as "Caribbean". The contract included the following translated clause designated as Article XVI, the interpretation of which controls the decision in this case:

"(1) Article XVI.—All disputes and/or differences which may arise in connection with the fulfilment and/or interpretation hereof, shall be referred to the arbitration in London of a single arbitrator mutually appointed by the parties.

"(2) If the parties cannot agree to appoint a single arbitrator, each of them shall appoint its own arbitrator and the arbitrators so appointed shall, in their turn, if necessary, appoint an umpire.

"(3) The parties undertake to act with all due diligence as to the appointment of the sole arbitrator or of each arbitrator and if default should be made by one of them in this appointment within maximum 8 (eight) working days as from and excluding the day of despatch to the defaulting party by the other party of a registered letter, the arbitrator appointed by the first party would be empowered to act validly as sole arbitrator as if he had been appointed by the defaulting party.

"(4) The award of the sole arbitrator, arbitrators and/or Umpire, shall be final and shall bind the parties hereto, who undertake to consider it as a rule of Court.

"(5) The arbitrator, the arbitrators and the umpire, shall be business men, not lawyers. Their fees and expenses shall be paid by the defaulting party.

"(6) The right for each party to request arbitration shall automatically cease within 30 (thirty) calendar days as from and excluding the day of delivery.

"(7) Made in four original copies and signed in Paris on the twenty-sixth of April, 1952."

Paragraphs (1) and (6) of the foregoing agreement of arbitration are the subject of interpretation under the facts of this case. Neither party has requested arbitration in accordance with paragraph (6), and the ultimate question is whether or not plaintiff's alleged claim is time-barred in accordance with the contract, thereby divesting this Court of any jurisdiction over the subject matter.

Following the execution of the contract in April, 1952, "S. N. C." remained in possession of the vessel and made one round trip voyage to the United States, returning to Rouen, France. Certain repairs were then made and "Caribbean" employed a marine survey company to inspect the vessel prior to actual delivery pursuant to a bill of sale executed by "S. N. C." on June 14, 1952, delivering title to "Caribbean". The crew of "Caribbean" boarded the vessel on June 17, 1952, and a receipt was given on this date, but further repairs were required and financial arrangements to protect the deferred payment had not been completed. "Reynolds", the parent company, deposited the sum of $810,000 under an escrow agreement with Manufacturers Trust Company of New York on June 27, 1952, and, on June 29, 1952, "S. N. C." released the Astree to "Caribbean", whereupon the vessel sailed for Jamaica, British West Indies.

While it is immaterial for the determination of this case to ascertain whether the day of delivery was June 17 or June 29, it should be noted that art. VII as modified by the addendum provides "delivery of the ship shall take place at the same time as the transfer documents are exchanged", i. e., June 29, 1952. It thus appears that, under paragraph (6) of art. XVI, the right of each party to request arbitration terminated, in any event, at the close of business on July 29, 1952, although the original and amended complaints allege that plaintiffs accepted delivery on or about June 17, 1952. In the interim period considerable difficulties were discovered as hereinafter indicated.

When the Astree sailed from Rouen, France, on the morning of June 29, 1952, she encountered excess engine vibration in a matter of 10½ hours. On the following day, June 30, when the vessel was 35 miles southeast of Falmouth, England, the Master sent the following message to "Caribbean's" Vice-President at Rouen:

"H. P. turbine giving excessive vibration and noise stop Pressure *guage* pipe twice broken stop Trouble started when Revs were increased to about 85 stop Chief suggest this should be investigated by Parsons expert as serious trouble may develop stop Present position 35 miles S.E. of Falmouth Stop Please advise (signed) Master".

At that time the ship was in ballast but, instead of diverting for inspection, she proceeded on to Jamaica, arriving at Ocho Rios on July 18, 1952. Extracts from the deck and engine room logs reveal that during seven days of the voyage (in some instances on more than one occasion during each day) engines were stopped due to trouble with the H.P. turbine. It therefore appears that the vessel's Master and "Caribbean" were on notice of some serious defect in the turbines, but the exact cause was unknown.

On July 19, 1952, the vessel sailed from Jamaica, carrying a full load of bauxite, destined for Mobile, Alabama, where she arrived on July 24. The next day she started her return trip to Ocho Rios riding "light", but in less than three hours it became necessary to stop the engines due to excessive vibration. The vessel returned to Mobile at midnight and, on July 26, 1952, marine experts inspected the vessel. On the following Monday, July 28, 1952, she again sailed for Ocho Rios and, after less than two hours, encountered engine difficulties. That afternoon the ship was returned to

the dock at Mobile and thereafter the propulsion machinery was removed and taken to the Waterman Steamship Company's yard where, according to the plaintiffs, the rotor was found to be 20/1000ths of an inch out of line. While this may appear to be a minor variation, it appears to be of major importance in the operation of the vessel's main propulsion equipment. Plaintiff contends that the maneuvering valve equipment was in a deteriorated condition because of inferior quality in metallic content and construction, and that this condition had existed with knowledge of "S. N. C." prior to the sale of the vessel.

Admittedly no notice of any trouble or defect was given to the seller until August 8, 1952, on which date plaintiffs' representative mentioned the difficulties encountered with the engines while settling a lesser claim involving repairs at Rouen, France, prior to the departure of the vessel. While no claim was made against "S. N. C." at that time, and no request for arbitration was ever made, it appears that on or about August 12, 1952, the purchaser's British surveyors addressed a letter to one J. Davaine of "S. N. C." making inquiry as to prior difficulties with the vessel. This letter was answered on August 20, but in no sense indicates any assumption of liability or waiver on the part of "S. N. C." The repair work was not completed until September 6, 1952. During the early part of October an official claim was filed with "S. N. C." seeking recovery of the cost of repairs aggregating $29,907, plus maintenance expenses and loss of use of the vessel while undergoing repairs, together with other items of expense and replacement, the total claim being $139,389.68. The original complaint was filed on December 8, 1952, seeking damages for breach of contract and for breach of statutory warranties given a purchaser by a vendor under French law. A portion of the allegations therein contained are sufficient to raise the question of alleged fraud on the part of the vendor.

In response to the original complaint, "S. N. C." filed a motion to dismiss for lack of jurisdiction, alleging that one of the plaintiffs, "Caribbean", and the defendant were foreign corporations. Thereafter, "Caribbean" executed an assignment of its claim against "S. N. C." to "Mines". An amended complaint alleging the assignment was then filed, same containing three causes of action: (1) a cause of action for breach of contract; (2) a cause of action for fraud; and (3) a cause of action for breach of warranty and breach of contract under Articles 1641 and 1643 of the French law. *In neither the original nor the amended complaint have plaintiffs sought a revocation of the contract, and there has been no offer to return the vessel with a demand for the purchase price. The plaintiffs admittedly continue to use the vessel.*

To the amended complaint "S. N. C." filed a motion to dismiss alleging that "Caribbean" was an indispensable party and the assignment was colorable. In a joint memorandum filed by District Judges Sterling Hutcheson and Robert N. Wilkin, it was held that "Caribbean" was not an indispensable party and that the assignment, being absolute and legal, was not colorable. The motion to dismiss was overruled and "Caribbean" was dismissed from further proceedings in this action.

In its original answer to the amended complaint "S. N. C." did not set up the arbitration clause as a defense, and, in fact, included a counterclaim seeking the recovery of $3,356.67. This answer was filed on February 17, 1954. One month later, on March 17, 1954, "S. N. C." requested permission to file an amended answer and, on April 13, 1954, leave was granted to file the amended answer which, after again asserting the defenses set forth in the original answer, added the arbitration clause as a bar to plaintiff's claim. The defendant did not reallege the counterclaim. This present motion for summary judgment followed and is now before the Court.

It should again be noted that the evidence and pleadings fail to reveal that any party to the controversy has ever

requested a stay of further proceedings pending arbitration. It is defendant's contention that the right to demand arbitration is time-barred, but, as the contract provided for arbitration, the Court is divested of jurisdiction to determine any dispute between the parties.

### Waiver of Arbitration Clause.

■ The now remaining plaintiff, "Mines", urges that defendant has waived its right to rely upon the arbitration clause as a defense asserted to the jurisdiction of this Court. It is argued that the filing of an answer and counterclaim on February 17, 1954, without reference to the provisions for arbitration, constitutes a waiver even though the Court permitted an amended answer to be filed one month later, which amended answer raised, for the first time, the interpretation of the arbitration agreement as a defense, with the previously alleged counterclaim having been abandoned. The delay occasioned between the time of institution of the action and the filing of the original answer is not attributable to any action of the parties litigant. It should also be noted that, in the interim, plaintiff filed an amended complaint.

Plaintiff relies upon Radiator Specialty Co. v. Cannon Mills, 4 Cir., 97 F.2d 318, 117 A.L.R. 299; and American Locomotive Co. v. Chemical Research Corp., 6 Cir., 171 F.2d 115, to support its contention of waiver. In both of these cases an application for stay of proceedings was injected into the case long after the issues had been defined. In the Radiator Specialty case the motion to stay the trial pending arbitration was made on the trial date, after a continuance had been granted the moving party six months prior thereto due to the absence of a material witness. While the Court properly denied the motion to stay the proceedings, the Court also said [97 F.2d 320]:

> "The cases relied upon on behalf of the defendant are all cases in which there was no dilatoriness or unexplained delay on the part of the party seeking arbitration and are not controlling".

The American Locomotive case involved a situation in which the motion to stay was not made until after the litigation had been in progress for more than seven years. Furthermore, Locomotive set up its contract right of arbitration by its original answer filed early in the proceedings and obviously planned to insist upon arbitration when a trial date was reached. Under such circumstances, in filing a counterclaim without asking for a stay until seven years later, the Court understandably held that the motion for a stay was unreasonable and inexcusable, thereby constituting a "default" in proceeding with arbitration.

No steps of any importance took place between the time of the filing of the original answer and counterclaim on the one hand, and the amended answer asserting lack of jurisdiction by reason of the arbitration agreement on the other hand. The present case is more in line with the rule stated in Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978, and Almacenes Fernandez, S. A. v. Golodetz, 2 Cir., 148 F.2d 625, 161 A.L.R. 1420.

To give serious consideration to plaintiff's theory of waiver under the facts of this case would do violence to Rule 12(h), Federal Rules of Civil Procedure, 28 U.S.C.A. In none of the cases cited by plaintiff was the jurisdiction of the court questioned by reason of the contents of the arbitration agreements, and it does not appear that any time limitation existed in any arbitration clauses. It may be effectively argued that had the defendant requested a stay at the time of the commencement of this action, plaintiff could have countered by pointing out that the thirty day period in the arbitration agreement had long since passed.

### Dispute in Interpretation of Foreign Law as Constituting a Dispute of a Material Fact.

■ It is fundamental that, if there be a disputed issue of a material fact, the Court should not grant summary judgment. In this case there is no dispute as to the factual situation, although

experts on French law have disagreed as to the interpretations to be placed thereon. Should the case be heard on its merits, these same "disputes" would exist and the Court would then be obliged to accept the interpretation of one or more of the experts or, in the alternative, arrive at its own conclusion upon a review of the French law and decided cases.

This issue is controlled by Finney v. Guy, 189 U.S. 335, 342, 23 S.Ct. 558, 560, 47 L.Ed. 839, in which it is said:

"Although the law of a foreign jurisdiction may be proved as a fact, yet the evidence of a witness stating what the law of the foreign jurisdiction is, founded upon the terms of a statute, and the decisions of the courts thereon as to its meaning and effect, is really a matter of opinion, although proved as a fact, and courts are not concluded thereby from themselves consulting and construing the statutes and decisions which have been themselves proved, or from deducing a result from their own examination of them that may differ from that of a witness upon the same matter. In other words, statutes and decisions having been proved or otherwise properly brought to the attention of the court, it may itself deduce from them an opinion as to what the law of the foreign jurisdiction is, without being conclusively bound by the testimony of a witness who gives his opinion as to the law, which he deduces from those very statutes and decisions".

A disputed interpretation of a foreign law does not raise a material issue of fact sufficient to preclude action on a motion for summary judgment where, as in this case, counsel agree that all of the pertinent foreign law has been properly submitted as evidence.

Applicability of Federal Arbitration Act.

 Does a contract of sale executed in a foreign country between a foreign corporation and an American corporation, wherein a vessel is involved and the American corporation as purchaser reserves the right in said contract to cause the formation of a Panamanian corporation to take title to said vessel with the American corporation remaining liable on the contract, constitute a "transaction involving commerce" with a foreign nation, within the meaning of § 1 of the United States Arbitration Act, 43 Stat. 883, as amended, 61 Stat. 669, 9 U.S.C. §§ 1–3? The answer must be in the affirmative. A "transaction involving commerce" is a broad term covering trade generally between citizens of this country and subjects of a foreign country, including the purchase and sale of property of all kinds and descriptions. Gibbons v. Ogden, 9 Wheat. 1, at page 189, 22 U.S. 1, at page 189, 6 L.Ed. 23; Welton v. State of Missouri, 91 U.S. 275, at page 280, 23 L.Ed. 347; Preston v. Finley, C.C., 72 F. 850, 859; United States v. Steffens, 100 U.S. 82, 25 L.Ed. 550; Henderson v. Mayor of City of New York, 92 U.S. 259, 23 L.Ed. 543.

Plaintiff relies upon The Volsinio, D. C., 32 F.2d 357. In that case a charter party was drawn in this country for shipments of sugar between Cuba and France with no cargo being consigned to, or brought into, any state of the United States from any other such state or foreign country. It was held that the Federal Arbitration Act was inapplicable under such circumstances in an action instituted in the United States District Court for the Eastern District of New York to recover damages for failure of the Genose shipowner to deliver the sugar in good condition at France.

While it is true that the bill of sale transferring title to the vessel herein was between a French corporation as "seller" and a Panamanian corporation as "purchaser", it should be noted that the original contract upon which this action is predicated was between a French corporation and an American corporation, with the American corporation remaining liable under such contract even though the formation of a Panamanian corporation may have been contemplated. "Mines", the Delaware cor-

poration, was designated in the sales contract as "the purchasers" and Article I therein provided:

"The sellers agree to sell without any restriction and under all lawful guarantees the totality of the property of the said vessel Astree as per clauses and conditions herein stipulated and agree to deliver said vessel to such company as is designated by purchasers. Purchasers agree to cause such company to pay the purchase price hereinafter set forth for said ship but if purchasers fail to designate such company or if such company fail to pay such purchase price these purchasers to remain responsible for payment of such purchase price and undertake to effect it in accordance with the clauses and conditions of this contract".

In the addendum executed in France on May 26, 1952, wherein it is provided that "Caribbean" agrees to become the purchaser, it is further stated:

"Reynolds Jamaica Mines, Ltd., will remain responsible for the proper execution thereof by the Caribbean Steamship Company and for the payment of the purchase price".

In view of the foregoing, it is difficult to sustain plaintiff's contention to the effect that this transaction was not one involving "foreign commerce". Moreover, "Reynolds", the parent company, deposited the bulk of the purchase price. Additionally, it will be observed that plaintiffs, through the medium of an assignment, eliminated "Caribbean" as a party plaintiff for the purpose of meeting defendant's motion to dismiss for lack of jurisdiction.

Counsel concede that the recent case of Bernhardt v. Polygraphic Company of America, 350 U.S. 198, 76 S.Ct. 273, touches upon the questions now before the Court. In Bernhardt the contract was one of "employment" and the court held that, under the law of Vermont, an agreement to arbitrate could be revoked any time before an award was made. But the opinion clearly points out that if the arbitration agreement concerns maritime transactions or transactions involving commerce, then the United States Arbitration Act is applicable.

It thus follows that the Federal Act controls this case and the arbitration agreement is, under the provisions of Section 2 thereof, *"valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"*.

### The French Law.

In its second cause of action as stated in the amended complaint, it is alleged:

"12. At the time the defendant delivered the vessel "Astree" to the plaintiff Caribbean Steamship Company, S.A., and prior thereto, the defendant knew of the defective condition of the said vessel as heretofore alleged, and failed to notify the plaintiffs thereof; to the contrary, with full knowledge of said defective condition, defendant wrongfully and falsely represented to the plaintiffs, their agents and servants, that the said vessel was sound, seaworthy, in good working condition, and in every respect fit for the purposes for which she was purchased.

"13. Neither of the plaintiffs had any knowledge of the aforesaid defective condition, and performed the terms and conditions of the contract of sale and addendum in complete reliance on the warranties and assurances of the defendant.

"14. That as a result of defendant's misrepresentation and/or concealment, plaintiffs have sustained the damage as aforesaid in the sum of Two Hundred Fifty Thousand Dollars ($250,000.00), which said damage has been demanded and remains due and unpaid."

Stated in simple terms the fraud alleged is in the withholding of the knowledge of hidden defects.

Section 1643 of the French Civil Code is interpreted to read:

"The vendor is liable for hidden defects even although he was ig-

norant of them, unless, in that case, it was stipulated that he was not bound by any guarantee".

Bearing in mind the stringent rule of French law applicable to vendors in cases involving hidden or latent defects, what then is the effect of an arbitration clause containing a time limitation in instances where the vendee has elected to retain the property and sue upon the contract without seeking a revocation or rescission of the contract?

Plaintiff has not elected to divorce itself from the written contract and institute an action sounding in tort as provided under Article 1382 of the French Civil Code[1], which deals with responsibility *ex delicto* or *ex quasi-delicto*. Liability *ex contractu* is imposed by reason of Article 1147 of the French Civil Code.[2] It is said that the "obligation" has a contract as its source if it follows from the stipulations of a sale or a loan, but the offense is the source if it comes from the damage caused by the fault of a person.[3] In its decree of January 11, 1922 (Pelletier v. Doderet) the Court of Cassation held that Article 1382 could find no application in the case of an obligation resulting from a contract. Again, in its decree of April 6, 1927, the same Court of Cassation ruled that Article 1382 extended only to cases of a criminal offense or criminal negligent act. Thereafter, in its decree of May 22, 1933 (Desmarais Fréres v. Chemins de fe de Paris á Orléans), it was said that a fault, relating exclusively to the execution of a freight contract as well as to a registration of a railroad car, presented a question of an exclusively contractual character. The Court of Appeals of Paris, in its opinion of January 7, 1954, held that Article 105 of the Commerce Code, providing that a consignee could not take any action after acceptance of delivery of merchandise and payment unless a formal protest is registered within three days thereafter, was valid and that a consignee failing to so protest could not proceed under Article 1382 for responsibility *ex delicto*.

It clearly appears from the French law referred to herein that, even had the present controversy been instituted in France, the action would be *ex contractu* and not *ex delicto*. Is it possible to institute an action *ex contractu* and disregard the basic arbitration provisions contained therein? The answer appears rather obvious—the contract is not to be treated in piecemeal fashion.

In the amended complaint, plaintiff quotes Article 1641[4] and Article 1643[5] of the French Civil Code. To consider intelligently the problem presented, it is also essential to read Articles 1644[6] and

1. The interpretation of Article 1382 is as follows: "Art. 1382—All acts whatever of a man, which cause another damage, oblige him by whose fault it has happened, to repair it."

2. The interpretation of Article 1147 is as follows: "Art. 1147—A party is liable for the payment of damages and interests, if there is no execution on his part of his duties under the contract or if there be faulty execution on his part, even if said non-execution or faulty execution be not due to any bad faith on his part, if he cannot show that the reasons therefore cannot be imputed to him."

3. See also Ripert and Boulanger, Traite de Droit Civil, Vol. II, 1952 Ed., Article 23.

4. Article 1641 is interpreted as follows: "The vendor is bound under guarantee by reason of hidden defects in the article sold which render it unfit for the use to which it is destined or which so diminished that use that the purchaser would not have bought it, or would have paid a lower price if he had known of them."

5. Article 1643 is interpreted as follows: "He (vendor) is liable for hidden defects even although he may have been ignorant of them, unless, in that case, he was not bound by any guarantee."

6. Article 1644 is interpreted as follows: "In the case of Articles 1641 and 1643, the buyer has the choice of surrendering the article and gaining restitution of the purchase price, or of keeping the article and regaining a portion of the price, such as it is determined by experts."

1645.[7] Thus it appears that from the French law, *absent any consideration of the arbitration agreement,* liability would attach upon a determination of defendant's motion for summary judgment on the action *ex contractu.* The Court of Cassation so decreed on April 11, 1933, in a case involving hidden defects by stating that an action would lie under Article 1645 of the Civil Code. But such an action as instituted in the case at bar is in direct conflict with the first and sixth paragraphs of Article XVI of the contract, which article contains the arbitration provisions. Plaintiff urges that "fraud destroys everything" and thus has the effect of nullifying the arbitration clause and particularly paragraph 6 thereof. Disagreeing with plaintiff, the effect of any pretended or alleged fraud would only obligate the seller to pay damages as provided by Article 1645, but would not have the effect of nullifying the contract or any part thereof. While undoubtedly a purchaser may, in case of fraud, seek a nullification of the contract, the resultant effect would be an abandonment of the contract with a return of the vessel, a restoration of the purchase price, and a claim for damages by the party so defrauded. Such an action would obviously do away with the arbitration clause, the competency clauses, and all other provisions. Plaintiff has not elected to proceed in this manner. It has retained and used the vessel since June, 1952, and does not intend to return same or restore the purchase price.

It is abundantly clear under the Laws of France that arbitration clauses are valid and must be respected and, where existing, courts of law have no authority or jurisdiction to determine questions which must be submitted to arbitration (Cassation, Ch. civ. 22nd January 1946, Dalloz, 1946. J. 239; Court of Appeal of Paris, 7th January 1954, G.P.1954. I. 224; Court of Appeal of Lyon 20th December 1954, Dalloz, 1955. J. 142; Court of Appeal of Bordeaux, 2nd May 1921, Recueil du Havre, 1921. II. 45; Cass. 27th February 1939, G.P. 1939. I. 672).

It is also apparent that time limitations may be validly inserted in arbitration clauses and the authorities are well settled that a thirty day provision is not unreasonable.[8] On this point there is no substantial disagreement among the experts on French law.

There is no doubt that, under Article 1643 of the French Civil Code, a vendor may relieve himself of the responsibility for guarantee of hidden defects. While the contract in question does not expressly relieve the defendant from this obligation, there is nothing contrary to public policy in limiting the rights of the buyer to a fixed period of time through the use of an arbitration clause, and if the parties do not elect to submit the disputed matter to arbitration, it has the ultimate effect and equivalent of a statute of limitations.

Finally, with respect to the French law, plaintiff insists that the first paragraph of the arbitration agreement has no relation to the sixth paragraph thereof. The words *"all disputes and/or differences* which may arise in connection with the fulfilment and/or interpretation hereof, shall be referred to the arbitration * * *"* are certainly all-inclusive. Plaintiff contends that this language applies only to disputes arising within the thirty day period. The difficulty lies in the wording of the contract, in that it does not so state. Moreover, a "dispute" or "difference" did arise within the thirty day period and was known to the purchaser. Plaintiff would have this Court interpret the agreement to mean that no action could be institut-

7. Article 1645 is interpreted as follows: "If the seller knew of the defects of the article, he is responsible, besides restoration of the price he has received for the said article, for all damages and interests suffered by the purchaser."

8. See Court of Appeals of Montpellier, 9th November 1954, G.P.1955, 3/4th February.

ed within the thirty day period provided for by arbitration, but that thereafter matters could be determined by litigation in a court of competent jurisdiction. Such a construction of the contract would render the arbitration agreement meaningless as parties could await the expiration of the thirty day period and then litigate. It is obvious that the parties intended to avoid litigation with its attendant expense and delays by inserting a provision that the arbitrators and umpire should be businessmen and not lawyers. Plaintiff's insistence on this point is without merit.

### The American Law.

■■ This Court has given mature consideration to the French law which may be deemed applicable, and has reached the conclusion that the motion for summary judgment must be granted irrespective of the applicable law. If the questions involved are substantive, rather than procedural, the French law affords no relief to plaintiff. If we are dealing with a procedural matter, the American law controls with the same result.

Under both systems of law, assuming arguendo that there was fraud in the inducement, the purchaser had an election of remedies. "Mines" could disaffirm the contract, return the property, demand the return of the purchase price, and thus free itself of the arbitration clause. It could retain the property, accept its benefits, affirm the contract, and sue for damages for fraud and deceit, in which event "Mines" ratifies the contract and is bound by the arbitration agreement. In this country it is generally recognized that an action by way of affirmance of the contract is a bar to the right to rescind. 24 Am.Jur. "Fraud and Deceit", § 191, p. 9; Cheney v. Dickinson, 7 Cir., 172 F. 109, 28 L.R.A.,N.S., 359; Jordan & Davis v. Annex Corp., 109 Va. 625, 64 S.E. 1050; Wilson v. Hundley, 96 Va. 96, 30 S.E. 492. One who affirms a contract acknowledges that he entered into the same and is bound by all of its provisions.

Again assuming arguendo that there was fraud in the performance, such an issue is subject to any arbitration clause and is not the proper subject matter for court action. In Almacenes Fernandez, S.A. v. Golodetz, 2 Cir., 148 F.2d 625, 628, 161 A.L.R. 1420, a case involving fraud in the performance and not in the inducement, the Court said:

"The plaintiff's effort to avoid arbitration on the ground that this suit is not within the scope of the arbitration agreement is also fruitless. There are no allegations in the complaint that the execution of any of the sales contracts by the plaintiff and Golodetz & Co. was tainted by fraud. What is alleged to have been fraudulent is the manner in which the seller broke the contracts by failing to ship merchantable caustic soda in compliance with them; by obtaining payment on false documents fraudulently issued; and by fraudulently inducing the plaintiff to accept the soda when it arrived in Mexico. It is thus clearly shown that the controversy between these parties has arisen out of the manner in which the seller undertook to perform the contracts after they had been made. The plaintiff is not seeking by virtue of what it has alleged is fraudulent in connection with the defendants' performance to rescind the sales contracts, but on the contrary is seeking to enforce them according to their terms. Whether the attempted performance by the seller was in accordance with the contracts is an issue between those parties clearly arising out of the contracts.

"The allegations in the complaint that the breach of the contracts included fraudulent representations by the sellers, the carrier and the insurer which induced the plaintiff's agent to pay for the soda in New York and the plaintiff to accept it in Mexico present issues which also have grown out of the manner of performance and which are, there-

fore, disputes arising out of the contracts which, *in so far* as they pertain to the buyer and the sellers, are within the agreement to arbitrate, for they are disputes based upon conduct after performance was begun and in connection with such performance. See In re Utility Oil Corporation, 2 Cir., 69 F.2d 524.

And this is so whether the sellers did .actually fulfill their contractual obligations, or whether they failed to do so, or whether in addition to such failure they and the carrier and the insurer fraudulently concealed such failure and thereby induced the buyer to perform after a breach by the seller.

"Nor does the joinder of other parties ·defendant in a suit wherein it alleges fraud in performance jointly by the sellers and other parties enable the plaintiff to escape from the effect of the agreement it made. The agreement to arbitrate is valid and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. Arbitration Act, § 3. No such grounds have been alleged".

The foregoing authority effectively disposes of the issue of fraud in the performance.

In the opinion of this Court it is unnecessary to determine the legal effect of the payment of $810,000 (the balance of the purchase price) by the escrow agent, Manufacturers Trust Company, to "S.N. C." on or about September 15, 1952, which date was obviously well beyond the time plaintiffs were fully advised as to the nature and probable extent of the damage. While it is apparent that "Reynolds" lost complete control over the money on June 27, 1952, when delivered to the escrow agent, this difficulty could have been overcome by attaching the funds in the hands of the New York escrow agent. The ultimate result is the same, as the failure to rescind the contract and retu🖉n the vessel is sufficient under the circumstances.

The validity of a contract under French law is dependent upon the validity of consent.[9] Any party may ask for rescission of a contract where consent has been induced by fraud.[10] If rescission is sought, the contract is terminated and completely void. Restoration of the consideration is made by both parties and the seller is liable in damages. The contract clauses would be meaningless. Here, however, the action is instituted on the contract and, as heretofore pointed out, the purchaser cannot bring a tort action independent of the contract. It follows that the clauses of the contract, including the much disputed arbitration clause, are still applicable.

While it is probable that the application of the arbitration clause is procedural and governed by the *lex fori*, it is not essential to so decide as the two systems of jurisprudence appear to be essentially the same, whether the fraud alleged be fraud in the inducement or fraud in the performance.

### Conclusion.

For the reasons discussed herein, the Court is of the opinion that there are no material issues of fact in dispute at this stage of the proceedings; that this Court is without jurisdiction to determine the merits of the controversy as the action is time-barred under the arbitration clause of the contract between the parties; and that the defendant's motion for summary judgment must be granted.

An order to this effect will be entered upon presentation. It is suggested that

9. Article 1109 of the French Civil Code is interpreted as follows: "There is no valid consent if the consent has been given only by mistake, or if it has been extorted by violence or surprised by deceit".

10. Article 1117 of the French Civil Code is interpreted as follows: "The convention contracted by mistake, violence or deceit, is not void without need of sanction; it only occasions an action in nullification or an annulment. * * *."

the various briefs and appendices be made a part of the record by said order as there are pertinent statements of counsel contained therein to which this Court has made reference.