# Richmond

ORION E. HAWKINS AND ALLAN C. HAWKINS V. ELEANOR
HAWKINS SYDNOR.

April 28, 1938.

Present, All the Justices.

The opinion states the case.

*Caskie & Frost,* for the plaintiffs in error.

*A. D. Barksdale, Edward S. Graves* and *Philip H. Hickson,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

Plaintiff was injured in an automobile accident at Roanoke. Seeking compensation, she brought suit against her father, who owned the car in which she rode, and her brother, who drove it. She has recovered a verdict and judgment.

In such circumstances, we give full faith to all credible unchallenged evidence which tends to support the recovery. When facts are in dispute, we accept those most favorable to her, provided we can do this without professing to believe things which we cannot believe.

She had lived with her father and mother in Campbell county, near Lynchburg, until her marriage to Fabian G. Sydnor in December, 1934. For some time preceding the accident, which was on July 3, 1936, they had lived in Norton, Virginia. About the middle of June she, with her little baby, came to visit her parents and was returning on the day of the accident in an automobile to Norton. This automobile belonged to her father, and it was his intention to drive it, but for some reason this plan fell through, and his son, Allan, something over seventeen years old, undertook to drive in his stead. He had considerable experience as a chauffeur and for two years had held a driver's permit and appears to have been competent and trustworthy.

To avoid the heat of this summer's day, an early start was made. They left between 4:30 and 4:40 A. M. At the wheel sat Allan, next to him a little sister, and at the right of the front seat sat his mother, Mrs. Ometa Hawkins, who held in her lap the plaintiff's baby. On the back seat to the left sat Mrs. Sydnor; at the right was a boy named Hatcher, while between them and on the floor of the car baggage was piled.

Their first stop was in Lynchburg at a bus station, for information. It was not yet open, and so they continued on to a suburban filling station and were there given a road map containing information desired. There was no further stop until the point of accident in Roanoke was reached, which was about 6:00 o'clock. Once or twice on the road the plaintiff spoke to her brother about the speed, and said that she was being shaken up. No complaint was made while in the city.

The distance traveled was about sixty-three miles, and the time consumed was between eighty and ninety minutes, which indicates an average speed of about forty-five miles

an hour. It is impossible to say with exactness what the rate of speed in Roanoke was; the witnesses do but guess. At one time Mrs. Sydnor said that she "supposed" that they were traveling at forty-five miles an hour; again she said that she was not looking at the speedometer and could not say just what the speed was. "I can't say how fast it was." She did not drive a car herself.

Mrs. Hawkins said: "I don't know so much about the speed of the car unless I was driving it myself, but I have thought about it and I think he must have been going around forty miles an hour. That is just my idea since I thought about it a little bit." Again she was asked: "As a matter of fact you state you don't know much about the speed and you are just estimating this by the amount of bump you got?" And she answered: "That is what I base it on. I wasn't looking at the speedometer."

Allan, the driver, said that they were traveling "around twenty-five or thirty miles an hour. Maybe more or less, I can't tell exactly."

None of these witnesses makes any definite statement. One "supposes," another "estimates," and all admit that they are not certain. The speed was not excessive; the hour was early, the street was straight and well paved, and at that hour not cumbered with traffic. Nor did any one complain or protest within the corporate limits of Roanoke.

This party entered Roanoke on Route 460, which later, and for a time, ran into and merged with Route 420. Along these routes and along Fourth street they passed. By the road map the route to the southwest, which runs along Fourth street, turns at an angle of about forty-one degrees into Commonwealth avenue. Into this intersection comes Seventh avenue, and a street-car track, along Seventh avenue and into Commonwealth avenue, crosses Fourth street at right angles. A few feet west of this car track Fourth street, which is well paved, is depressed for drainage purposes; that is to say, this depression was intended to carry surface water across this street at that point. This depression, from its beginning to its end, is about twenty feet

and reaches a maximum depth of seven and one-half inches at a point thirteen and one-half feet from the beginning, and from that point comes to an end six and one-half feet away. Otherwise expressed, we have a shallow depression in Fourth street twenty feet long and with an extreme depth of seven and one-half inches.

As they approached Commonwealth avenue, Mrs. Hawkins told her son to turn to the right, which would have taken them along the designated road to the southwest. There is some conflict of evidence as to when this instruction was given. On direct examination, she at first said that she could not tell, and this statement she repeated, but when pressed by her counsel, finally answered: "I suppose we were somewhere along about the beginning of the block. I don't know though." Allan says that his mother spoke to him when they were about at the point of intersection and at a time which would have necessitated a sharp turn to the right. He thought that it would be better to go forward on Fourth street and turn later into Commonwealth avenue. While he had been to Roanoke a number of times, he had never driven a car in that city.

The car went into this depression. Mrs. Sydnor was thrown against the roof. The first lumbar vertebra was compressed and fractured, and she was painfully injured. If recovery can be had at all, the verdict was not excessive.

She was a guest and can recover neither from her father nor from her brother unless the brother was grossly negligent. *Boggs* v. *Plybon,* 157 Va. 30, 160 S. E. 77, and many later cases reaffirm the doctrine there adopted.

This depression could have been seen by one who was looking for it, and who knew that it was there, 171½ feet away. Allan, who did not know it was there, never saw it until too late, although he was paying attention to the road.

Mrs. Hawkins, on direct examination, said:

"Q. Which way were you looking?

"A. I was looking straight ahead at the intersection and expecting him to make the turn just as I had directed him to.

"Q. Do you mean you were following the route with your eyes, the one you should have gone on?

"By Mr. Caskie: Don't lead her, Dick.

"By Mr. Barksdale:

"Q. Which route were you following with your eyes?

"A. Just the street we were on where it turns around there. That is all the farther I could see. I was watching the route I knew."

This is her evidence on cross examination on that point:

"Q. You stated you were looking straight ahead?

"A. Yes, sir, I was.

"Q. Did you see this depression at all until after you had gone over it?

"A. No, sir, I didn't see it."

Among many instructions given is this:

■ "The court instructs the jury that a driver on a public highway or street has a right to assume, in the absence of knowledge to the contrary, and act on the assumption, that a public street or highway through its entire width intended for travel, is in a reasonably safe condition, and he is not required as a matter of law to be on the lookout for defects or obstructions, and therefore if you believe from the evidence that the accident complained of here was the result of a defect or faulty construction in the street, and of the mere failure of the driver to observe a depression or a drain across the street in time to avoid the jar or bump as he passed over, which was a result of mere lack of foresight or attention, and was not guilty of such negligence as would justify the plaintiff, Mrs. Sydnor, to recover in this case, and you must find for the defendants."

■ The plaintiff did not object to this instruction, and the defendants have accepted it. It therefore becomes the law of this case, and indeed, it is the law of every case. *Jones* v. *Massie,* 158 Va. 121, 163 S. E. 63, 64. That case is quite like this in judgment. Jones, with Massie as a guest, was driving down a Norfolk street, Chapel street, to which he was a stranger. Across that street is a "flat gutter" or depression, put there for drainage purposes.

This "flat gutter" is twenty-five feet long with a maximum depth of three inches. He recovered a judgment which this court set aside. In the course of the opinion, we said:

" * * * but it may be said the evidence shows, that Mr. Jones could have seen the conditions at a sufficient distance to have permitted him to either stop or check the speed of his car before entering the intersection, and if he had done so the accident would not have occurred."

And again:

"There is no evidence to indicate that in failing to see the conditions at the crossing in time to avoid the injury, he 'knowingly or wantonly' added to the risks which Mr. Massie, as his guest, had assumed."

These cases are extraordinarily alike. Jones was driving down a strange street as was young Allan Hawkins. Neither of these drivers noticed these depressions in time to avoid the accident, and either could have seen them in time to do so. They differ in this: Hawkins was probably driving faster than Jones, but not at an unlawful speed and not at a speed to which any one objected while within the limits of Roanoke. The Chapel street "flat gutter" was three inches deep and the Fourth street depression reached a maximum of seven and one-half inches.

To undertake a review of all the automobile accident cases would be unfruitful. There is little controversy about general principles. Their application gives us trouble, and this because we find it at times impossible to agree upon those facts which govern. It would shock one's sense of justice to hold that this brother was guilty of gross negligence in failing to observe this shallow depression in time and to appreciate its possibilities. The principles applied in *Jones* v. *Massie, supra,* govern here. As was said by Chief Justice Campbell in *Young* v. *Dyer,* 161 Va. 434, 170 S. E. 737, 739:

"A mere failure to skilfully operate an automobile under all conditions, or to be alert and observant, and to act intelligently and operate an automobile at a low rate of speed may, or may not, be a failure to do what an ordi-

narily prudent person would have done under the circumstances, and thus amount to lack of ordinary care; but such lack of attention and diligence, or mere inadvertence, does not amount to wanton or reckless conduct, or constitute culpable negligence for which defendant would be responsible to an invited guest."

Since the plaintiff has no case upon its merits, we need not consider other assignments of error.

For reasons stated, judgment is reversed. Final judgment should be entered for the defendants, and it is so ordered.

*Reversed.*