# 𝔖taunton

## ELSIE B. MURPHY v. GEORGE McINTOSH, ET AL.

September 6, 1957.

Record No. 4698.

Present, All the Justices.

The opinion states the case.

*Charles Pickett (Wilbur C. Hall; Pickett, Keith & Mackall,* on brief), for the plaintiff in error.

*Ernest T. Gearheart, Jr. (Jesse, Phillips, Klinge & Kendrick,* on brief), for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

Elsie B. Murphy filed a bill of complaint against George C. McIntosh and Nellie S. McIntosh, husband and wife, for specific performance of a contract, wherein the defendants agreed to purchase from the complainant a tract of land and certain personal property for the sum of $73,000. The bill charged that the defendants repudiated the contract without just cause, and that they demanded the return of the deposit which they had made when the contract was signed.

Defendants answered and admitted they had repudiated the contract on the ground that it was procured through the fraudulent misrepresentations and concealments of the complainant by her agent, John A. Johnston, with respect to a material fact, namely that the improvements on said property were not infested by termites.

During the pendency of the suit, Miss Murphy resold the tract of land for the sum of $57,500, excluding from the sale certain personal property listed in the contract with the McIntoshes. Thereafter, upon motion of defendants, the cause was transferred from chancery to the law side of the court, without objection, and leave was granted Miss Murphy to amend her bill so as to conform to an action at law for breach of contract. Miss Murphy thereupon reformed her bill to motion for judgment, claiming damages in the sum of $16,802.50.

Defendants' grounds of defense to the motion for judgment were the same as those set out in their answer in the chancery proceeding. They also asserted a counter-claim against Miss Murphy in the sum of $2,000.00, the amount of the deposit made by them at the time of the execution of the contract of sale.

Upon the issues the case was submitted to a jury, which returned a verdict in favor of the defendants for the sum of $2,000.00.

The court overruled a motion to set aside the verdict as contrary to the law and the evidence, without evidence to support it, and con-

trary to the weight of the evidence, and entered judgment in accordance with the verdict.  We granted this writ of error.

■ The evidence was conflicting, and the jury resolved the conflict in favor of the defendants.  The trial court has approved the verdict of the jury, and we must, therefore, under often repeated and settled principles, accept as true every credible fact which the evidence in favor of the defendants tended to prove, and which was essential to be proved to entitle them to the verdict.  Stated in the light most favorable to the defendants, the evidence may be summarized as follows:

■ On April 8, 1952, George C. McIntosh entered into negotiations with John A. Johnston, a real estate broker, for the purchase of Miss Elsie B. Murphy's farm in Loudoun County, Virginia.  Johnston was the sole, exclusive agent for the sale of the property. George C. McIntosh, his brother, Robert, and Johnston went to the farm and inspected the house and its surroundings.  While there, George C. McIntosh said he asked Johnston "if there had at any time been evidence of termites in the place?"  McIntosh said that was all he asked Johnston, and Johnston told him "that the place had been inspected either two or three years prior to that, and it was coming up for either its third or fourth inspection under the terms of a contract that Miss Murphy had with the Terminix people."  They were then standing in the driveway of the property, and out of the hearing of any other person on the premises.

On the following day, April 9th, George C. McIntosh returned to the property with his wife, Nellie S. McIntosh, and after inspecting it, they went to Johnston's office where a contract of sale was prepared.  While Mrs. McIntosh was typing the contract, McIntosh said he asked Johnston "whether there was any activity so far as the termites are concerned?"  Johnston replied there was none, and repeated his statements about inspections under the Terminix contract, saying he could not recall whether there had been two or three inspections, and that one more was due in June.  He did not tell McIntosh what the inspections disclosed, or that the property had been infested with termites and had been treated therefor.

Certain changes were made in the contract typed by Mrs. McIntosh at Miss Murphy's request.  One of the changes required that the McIntoshes maintain the property from the date of the contract. The contract as agreed on was dated April 19, 1952, although it appears from marks thereon that it may not have been signed by all of

the parties until April 24, 1952.

McIntosh testified that on April 8, 1952, the joists in the furnace room on the basement level were completely covered with a "composition celotex or celotex composition;" that between April 9th and June 10th, 1952, he and his wife and children visited the property frequently, worked on it, and maintained it as required under their contract; that in the meantime his wife, in preparation for removal to the farm, arranged to abandon some political activities in Arlington County in which she was then engaged; that on June 8th, he saw a celotex board hanging down from the overhead rafters in the basement, exposing the beams; that upon inspection the beams appeared to be eaten by insects, which he then thought might be termites, but which he was later informed were known as wood borers; that this made him suspicious and led him to consult W. O. Pruitt, a termite expert; that Pruitt went to the property with him, his wife, Johnston, and another person on June 10, 1952, and Pruitt pointed out to him live termites in action and evidence of considerable previous termite infestation; and that this was his first information of past or present termite infestation. Upon this discovery, Johnston told McIntosh that he would consult Miss Murphy or the Terminix people and have them make an inspection.

On June 26, 1952, Johnston, in response to a telephone conversation with McIntosh, wrote the latter that Miss Murphy had gotten the Terminix Company, employed by her, to make an inspection of her property as of June 24th; but that he had not yet received its report. Miss Murphy's contract with the Terminix Company of Maryland and Washington, Inc., dated April 10, 1950, provided for an immediate insulation of her building against termites for the sum of $745.00, and for annual inspections thereafter, upon the payment of $45.00 per year, with the right of Miss Murphy to terminate the agreement as of any anniversary date, and the right of the Terminix Company to terminate the same as of the fifth or any later anniversary date.

On July 4, 1952, Johnston wrote McIntosh that he had received an inspection report from the Terminix Company to the effect that it had found "no evidence of any termite activity as of June 24, 1952." Johnston suggested a further inspection of the premises by a firm agreed upon by Miss Murphy and the McIntoshes. Following this letter, McIntosh consulted Pruitt again, and on July 10, 1952, McIntosh, his brother, Robert, Pruitt, and a friend went again to the

premises. There they watched Pruitt dig live termites from a window sash in the basement of the house. The termites were placed in a mayonnaise jar, kept alive for a month, and thereafter exhibited in evidence.

On the same day, July 10, 1952, McIntosh wrote Johnston, saying, "We have again examined the premises and have definite proof of live termite infestation;" and requesting, "with regret and disappointment," cancellation of the contract of sale, and return of the deposit money. McIntosh said that shortly afterwards Johnston, for the first time, told him that the property had been infested with termites in May, 1950, and treatment then given for their eradication. He further said that he learned there had been only one annual inspection since the property had been treated in 1950.

W. O. Pruitt, operating the Termite Control Company, testified he had been in business of treating houses infested with termites since 1933; and that his examinations of the property disclosed evidence that the joists to the house were very badly eaten by both beetles and termites. He described the activity of termites, and said, in his opinion, termites had been working on the joists for a long time, that is, "several months before, because I never saw a place where they got in and made as much activity just in a few days or weeks." He told of gouging live termites out of a window sash of the house and placing them in a glass jar as exhibits.

R. B. Taylor, District Manager for the Terminix Company, of Maryland and Washington, said his company entered into a contract with Miss Murphy to inspect and treat her property for termites in May, 1950; that inspection showed the property was infested with termites, and treatment was given on May 11, 1950; that the property was inspected May 11, 1951, and June 24, 1952, and on each occasion found free of infestation; that his company on July 14, 1952, found a "slight recurrence of activity;" and that in March, 1953, no signs of termites were found, but in April, 1954, traces were found requiring re-treatment. He described the biological history of termites, their habits and activities. He said that the reason for annual inspections is "that termites have a way of coming back." He did not remember making a statement on July 14, 1952, with respect to termite inspection, substantially as follows: "Where you find one there may be a million;" but agreed that it was "highly possible," that he made the statement, and he did not desire to "discount it."

Mrs. McIntosh said she and her husband were very desirous of ac-

quiring the farm; that after the contract of sale was signed they got estimates on repainting and redecorating the house, and cleaned up the premises; and that she first observed the ceiling boards of the furnace room hanging down on June 8, 1952, and would have observed that condition earlier on various previous visits to the basement if it had then existed.

Several other witnesses corroborated the testimony of McIntosh with respect to more or less material circumstances.

J. R. Hoy, Jr., an attorney at law representing McIntosh at the time of the sale of the property, said Johnston admitted to him and McIntosh in July, 1952, that he had not told McIntosh in April, 1952, that the property had been infested with termites and treated for them.

Johnston said that on April 8th, McIntosh asked him whether he "knew if there were any termites on the property, in the house, in the dwelling. He (McIntosh) had seen some holes in some supports in the ceiling of the basement room from which the covering had been removed;" that he told McIntosh that as far as he knew, "there was none," because he thought they were beetle holes made by woodborers; that Miss Murphy had never mentioned termites when she listed the property with him for sale; that on April 9th, McIntosh asked him again if he "was sure there were no termites in the building;" that he replied that he was "reasonably certain if there had been Miss Murphy would have eradicated them;" that so far as he knew she had not found them and had not told him anything about their presence there; that McIntosh said "he wanted to be certain that they were not termites, he had experience with termites in a house he bought once, would not buy a house that had termites and he wanted to be very certain about it;" and that later the same day he went to see Miss Murphy. Miss Murphy then told him that the property had been infested with termites in 1950; that it had been treated for them; and that she had a contract for annual inspections and there had been two or three such inspections. Johnston said he conveyed this information to McIntosh by telephone on the night of April 9, 1952, an action which McIntosh positively denied when called to testify in rebuttal.

The three assignments of error present only one question: Did the evidence justify the jury in finding that Miss Murphy's agent fraudulently misrepresented or concealed the condition of the Murphy premises with respect to its infestation with termites?

The trial court gave nine instructions to the jury, and no error is here assigned to any of them. The instructions told the jury the principles which should guide them in determining whether the defendants breached their contract without just cause, the definition of fraud, upon whom the burden of proof of fraud rested, and the distinction between representation of fact and expressions of opinion. The instructions thus became the law of the case. *Hawkins* v. *Sydnor*, 170 Va. 267, 272, 196 S. E. 619.

Instructions numbered I and II and 2 present the respective theories of the parties.

Instructions I and II read as follows:

"Instruction No. I. The Court instructs the jury that if you believe from the evidence that, prior to the execution of the contract, the plaintiff or her agent did not answer truthfully any questions asked about termite activity or concealed by means of half-truths the previous history of infestation of the premises by termites and the treatment of the premises for such infestation and that such untruths, half-truths or concealment, if any, reasonably led the defendants to believe that the premises were free from termites then your verdict shall be for the defendants. It makes no difference whether the plaintiff or her agent honestly believed that the said premises were not at the time infested with termites, if in fact they were so infested."

"Instruction No. II. If you believe from the evidence that the defendants, from their own observation or from information given them by the plaintiff or her agent prior to the execution of the contract, knew or should have known that there was or had been termite infestation of the premises then you should find that there was no fraud and your verdict shall be for the plaintiff."

Instruction number 2 told the jury that if they "should believe from the evidence that the plaintiff's broker merely expressed his opinion that there was no termite activity upon the property or his opinion that the property was not infested with termites, or that the defendants did not rely upon the statements made by *defendants'* broker, the jury should find a verdict in favor of the plaintiff and assess her damages in accordance with instruction or instructions relating to damages."

It is clear that the defendants wanted to acquire the property. It is equally clear that they agreed to purchase it upon the representation and understanding that it had been and was free from termite

infestation. McIntosh persisted in questioning Johnston specifically whether there were or had been termites in the property. According to McIntosh, Johnston repeatedly told him, prior to the execution of the contract, that he knew of no termite activity there. While Johnston did tell him that Miss Murphy had a contract with the Terminix Company for inspection of the property, he did not tell him that the inspection in 1950 disclosed infestation.

Johnston's answers contained only a part of the truth; while his principal, Miss Murphy, was fully aware of the whole truth. His answers dealt with matters of fact, not matters of opinion, and were calculated to mislead the defendants and deter them from making an independent investigation. Whenever the defendants' suspicions were aroused, they were quieted by the assurance of Johnston.

The evidence shows that the value of a house is affected by termite infestation, and that one can never be sure that once infested and treated therefor, the premises will thereafter be free from the insects. Subsequent inspection, and further treatment are often necessary. The withholding of the fact that the house had been infested in 1950, and the statement of Johnston in April, 1952, that there was then no termite activity amounted to the concealment and misrepresentation of material facts susceptible of exact knowledge, particularly in view of the specific inquiries made by the defendants.

In view of the instructions which, as we have said, became the law of the case, it is not necessary to make a lengthy citation of legal authority. Every case involving allegations of fraud must be adjudged upon its own facts, and the circumstances which warrant or forbid relief cannot be scheduled by any fixed rule.

In *Packard Norfolk* v. *Miller*, 198 Va. 557, 562, 95 S. E. 2d 207, in discussing the difference between representations of fact and expressions of opinion, we quoted with approval the following statement from 23 Am. Jur., Fraud and Deceit, § 28, page 784:

" 'There is no certain rule by the application of which it can be determined when false representations constitute matters of opinion or matters of fact, but each case must in a large measure be adjudged upon its own facts, taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances.' " (198 Va. page 562).

See also *Poe* v. *Voss*, 196 Va. 821, 825, 86 S. E. 2d 47; *Garrett* v. *Finch*, 107 Va. 25, 28, 57 S. E. 604; 8 M. J., Fraud and Deceit, § 7,

262

page 699, and § 10, page 702; 23 Am. Jur., Fraud and Deceit, § 111, page 892; and Annotations 141 A. L. R. 967, and 174 A. L. R., page 1012, *et seq.; Blackman* v. *Howes,* 82 Cal. App. 2d 275, 185 P. 2d 1019, 174 A. L. R. 1004.

■ The facts distinguish this case from *Poe* v. *Voss, supra,* and other cases relied upon by Miss Murphy.

In *Poe* v. *Voss, supra,* the obvious condition of the house and furnace, and the statements of the vendor were sufficient to excite the suspicions of a reasonably prudent man, and they did excite them, for the vendees asked for and were given an opportunity to make a full and complete examination of the true conditions. Here, as we have seen, the purpose and effect of Johnston's concealment of the full facts were to lull the defendants into a false sense of security and thus avoid any independent investigation on their part.

Here the instructions of the court were written in language that was clear, simple and easy to understand. There was evidence that vendor's agent did not truthfully answer the questions of McIntosh about termite activity on the premises, and that the agent's concealment of the whole truth "reasonably led defendants to believe that the premises were free from termites." There was also sufficient evidence for the jury to find that defendants were not careless or indifferent to "their own observation" or to the "information given them by" vendor's agent, and consequently did not know or become charged with the knowledge, that there was or had been termite infestation of the property.

We find no evidence in support of the contention of Miss Murphy that domestic discord between defendants, leading to their separation, was the real cause for their repudiation of the contract.

It is manifest that the jury applied the law as stated in the instructions to the facts found by them; their verdict has been approved by the trial court; and we find no error in the proceeding.

Therefore, the judgment appealed from is affirmed.

*Affirmed.*

BUCHANAN, J., concurs in result.